FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

**FILED**

JAMES J. WALDRON, CLERK

**May 26, 2010**

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY:  s/ Margaret Cohen, DEPUTY

In re:
BAYONNE MEDICAL CENTER,

            Debtor.

Case No.:        07-15195 MS

ALLEN D. WILEN, as the Liquidating Trustee
of Bayonne Medical Center,

            Plaintiff,

v.

PAMRAPO SAVINGS BANK, S.L.A.,

            Defendant.

Adv. No.:        08-2256 MS

Judge:        Morris Stern

**O P I N I O N**

**SILLS CUMMIS EPSTEIN & GROSS, PC.**
Philip R. White, Esq.
Andrew H. Sherman, Esq.
One Riverfront Plaza
Newark, NJ 07102
Attorneys for Official Committee of Unsecured Creditors

**GIBBONS P.C.**
Frank Vecchione, Esq.
Dale E. Barney, Esq.
Natasha M. Songonuga, Esq.
One Gateway Center
Newark, NJ 07102-5310
Attorneys for Pamrapo Savings Bank, S.L.A.

# TABLE OF CONTENTS

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        The February 2005 Unsecured Line of Credit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        The May 2006 Unsecured Line of Credit Transaction . . . . . . . . . . . . . . . . . . . . . . . 9
        The Nuveen Loan Closing and the $1,000,000 Payment to Pamrapo. . . . . . . . . . . . . 16
        BMC Default; Mortgage Given to Pamrapo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IV.     Prior Ruling on "Insider" Status of Bank in Mortgage Transfer . . . . . . . . . . . . . . . 28

V.      Current Motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        A.      Standard of Review; Burdens; Relevant Evolution of § 547 . . . . . . . . . . . . . . 32
        B.      Insider Determination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
                U.S. Medical and Winstar As Precedent . . . . . . . . . . . . . . . . . . . . . . . . 36
                Essence of Plaintiff's Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
                "Any" Transaction Not at Arm's Length Defining Status for the
                "Challenged" Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
                Impact on Policy of Equality of Distribution . . . . . . . . . . . . . . . . . . . . . . 53
        C.      "Ordinary Course" Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
                Debt Incurred in the Ordinary Course . . . . . . . . . . . . . . . . . . . . . . . . . 57
                Transfer Made in the Ordinary Course of Business of BMC
                and Pamrapo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
        D.      Insolvency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

VI.     Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**HONORABLE MORRIS STERN**

## I.     INTRODUCTION

Opposing motions for summary judgment were presented, with the plaintiff[1] seeking avoidance of a purported preferential transfer.  These motions test the concepts of "insider" and "ordinary course of business."  The dispute arises out of partial repayment of a community bank loan.  That loan was to and for the benefit of the community's nonprofit hospital.  Hospital-bank connections were as expected in Bayonne, New Jersey, a small, densely populated port city set somewhat apart at the southern tip of a water-bound Hudson County peninsula.  It is, even today, a tightly knit hometown retaining a certain admirable independence, pride and spirit.

Bayonne Medical Center ("BMC"), established in 1888 and at the heart of its community, encountered the pitfalls of modern hospital economics and was driven to incur more and more debt.  Healthcare facilities bond issues floated through the conduit of the New Jersey Health Care Facilities Financing Authority ("HCFFA") provided aid, then first aid, then were sought out for life support itself.  Other financing, including bank loans, supplemented bond sale proceeds.  Cash flows depended on such interstices as reimbursement by private health insurers, Medicare, Medicaid, and state charity care funding; outside competition sapped those in-patient pools capable of funding hospital operations; important but financially risky services were terminated (e.g., obstetrics).  This hospital's survival (as with many throughout the state and region) was seriously at issue by some time in 2006.

---

[1]Plaintiff is the trustee of a post-confirmation liquidation trust and successor in this litigation to the Official Committee of General Unsecured Creditors of the debtor-hospital.

Meanwhile, Pamrapo Savings Bank ("Pamrapo")[2] operated for generations in Bayonne, expanding its banking business within its niche.  It has been and remains in and of Bayonne (having its main office and eight of eleven branches located in the city).  Besides certain common memberships on the bank board of directors and the hospital board of trustees which linked the two longstanding local institutions, in 2005 Pamrapo issued a commercial *unsecured* $2 million line of credit to BMC on favorable terms.  In May 2006 the earlier unsecured line of credit was increased to $3 million as a bridge loan in anticipation of $80 million of new bond issue funding.

As BMC fell faster toward bankruptcy (eventually filing on April 16, 2007), Pamrapo was, first, repaid $1 million of its then $3 million loan balance (by check written October 13, 2006, and honored October 17, 2006) out of bond anticipation note financing of $10 million.  Then, after the $80 million bond fund application was rejected and a formative hospital board meeting of December 7, 2006, the remaining Pamrapo loan balance became secured with a mortgage on hospital real property. This court has already awarded partial summary judgment to the plaintiff voiding the December mortgage as a preferential transfer to the bank, taking place not within ninety days of BMC's petition filing, but within one year of that date.  The extended bankruptcy preference avoidance period (looking back from the petition date up to a full year) was based on a finding that in the mortgage transaction the bank was an "insider" of the hospital.

---

[2]"Pamrapo" is, historically, the area overlapping the northern boundary of Bayonne with neighboring Jersey City; the term is said to be Native American originating with the Lenni Lenape, who were living in northeastern New Jersey in the seventeenth century at the time of European contact.  *See, generally,* Jersey City Past and Present, http://www.njcu.edu/Programs/jchistory/Pages/G_Pages/Greenville2.htm (last visited May 17, 2010).

The hospital's dire financial condition ("insolvency") at the time the mortgage grant became effective went essentially uncontested by the bank.  No "ordinary course" defense was raised as to the late-in-the-day securing of the bank loan.

Now before the court are the issues of BMC's solvency at the time of the October 2006 partial loan repayment, Pamrapo's contested status as an alleged "nonstatutory" insider in this transfer, and the disputed defense contention that the repayment was made "in the ordinary course."

## II.    PROCEDURAL HISTORY

After BMC filed its April 16, 2007 voluntary petition under Chapter 11, an Official Committee of General Unsecured Creditors (the "Committee") was appointed.  By Order entered on September 24, 2007 the court granted the Committee standing to pursue this adversary proceeding to recover alleged preferential or fraudulent transfers to Pamrapo.  The Committee filed its complaint in this adversary proceeding on September 16, 2008, later amended on April 14, 2009.[3]

---

[3]The counts of the First Amended Complaint are:

| | |
|---|---|
| I | Preferential transfer– partial loan balance payment of October 2006 to Pamrapo |
| II | Preferential transfer– February 2007 payment of principal and interest to Pamrapo |
| III | Preferential transfer– March 2007 payment of principal and interest to Pamrapo |
| IV | Fraudulent transfer–N.J.S.A. 25:2-27(b)–partial loan balance payment of October 2006 to Pamrapo |
| V | Preferential transfer–11 U.S.C. § 547– mortgage of December 2006 to secure Pamrapo loan |
| VI | Preferential transfer–N.J.S. 14A:14-14– mortgage of December 2006 to secure Pamrapo loan |
| VII | Fraudulent transfer–11 U.S.C. §§ 548, 550–mortgage of December 2006 to secure Pamrapo loan |

3

On April 9, 2009 the court entered an Order confirming the debtor's First Amended Plan of Reorganization which created a liquidating trust, dissolved the Committee and named Allen D. Wilen as the Liquidating Trustee. The Liquidating Trustee became the plaintiff in the ongoing adversary proceeding.[4]

On November 25, 2009 the plaintiff and defendant filed cross-motions for summary judgment on various counts of the First Amended Complaint.[5] The court heard oral argument on December 29, 2009, at which time partial summary judgment was rendered. The court granted the Trustee summary judgment on Counts V and IX (ruling that the December 2006 mortgage transfer was a voidable preference to an insider). Partial summary judgment was also granted to the Trustee on Counts II and III (determining that the *principal* portions of certain February 2007 and March 2007 payments to Pamrapo were voidable preferences). The court granted the bank partial summary judgment on Counts II and III (determining that the *interest* portions of the February 2007 and March 2007 payments applied to Pamrapo were in the ordinary course and thus not voidable). Summary judgment was awarded Pamrapo as to the following counts and causes of action: Counts I and IV, purported preferential transfer of $1 million in October 2006

---

| VIII | Fraudulent transfer–N.J.S.A. 25:2-25 and 25:2-27–mortgage of December 2006 to secure Pamrapo loan |
|------|------|
| IX | Fraudulent transfer–N.J.S.A. 25:2-27(b)–mortgage of December 2006 to secure Pamrapo loan |
| X | Equitable subordination pursuant to 11 U.S.C. § 510(c) |

[4]The court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and the Standing Order of Reference entered on July 23, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (F), (H) and (O).

[5]The Committee moved for summary judgment on Counts I, II, III, IV, V, IX and X; the bank cross-moved on Counts I, II, III, IV, VI, VII, VIII and X.

(per § 547 of the Bankruptcy Code and the parallel provisions of state law at N.J.S.A. 25:27(b)),

were dismissed based on a finding of solvency on the transfer date, a finding which was *later*

*reconsidered*; all bankruptcy and state law fraudulent transfer claims (except for

N.J.S.A. 25:27(b)) as to both the October and December transfers (Counts V, VI, VII and VIII),

were dismissed, with a finding that the antecedent debt occasioned by the earlier bank loan was

adequate value; and, Counts VI and X (New Jersey corporate law of preferences in anticipation

of *receivership actions,* and equitable subordination per Code § 510(c)), were found to be

inapplicable and/or nonmeritorious.   The court entered the Order on these rulings on January 11,

2010.

The Trustee filed a Motion for Reconsideration on Counts I and IV on January 22, 2010

seeking leave to prove that the debtor was insolvent at the time of the October 2006 repayment

by BMC of $1 million against the $3 million loan balance due Pamrapo at that time.  At a

hearing on February 23, 2010 the court vacated the summary judgment previously entered

against the Trustee with respect to Counts I and IV[6].  By Order entered on March 4, 2010 the

---

[6]The summary judgment on Counts I and IV, preferential transfers to purported insiders
within one year of the petition date, was awarded the bank because the Trustee's financial
expert's report, submitted in support of the Trustee's summary judgment motion to establish the
necessary element of insolvency, *on its face proved the opposite*.  In fact, essentially every
narrative statement of conclusion and most financial statements in the report showed balance
sheet solvency for BMC as late as October 31, 2006.  The single set of adjusted balance sheets
that differed, showing insolvency on October 31, 2006, indicated solvency on September 30,
2006.  In deference to the Trustee's position in defense of summary judgment, the court
formulated a proportionate per diem "burn rate," rather than simply relying on a two-point test
(i.e., solvency as October began and insolvency at month's end).  Yet, even using such a
proportionate daily burn rate, on the face of the expert's adjusted balance sheets, insolvency
*postdated* the $1 million transfer date (October 17, 2006).  On reconsideration, it was established
that the expert's critical balance sheet included a substantial data entry or typographical error
which skewed the burn rate numbers.  On that basis the summary judgment against the Trustee
on the $1 million claim was vacated, though the solvency issue persists.  *See* Part V (D), *infra.*

5

court allowed the parties to renew their motions for summary judgment on the $1 million

preference Counts I and IV and to file new submissions addressing the defendant's ordinary

course of business defense, its insider status, and the debtor's insolvency.

## III.    STATEMENT OF FACTS

BMC, at all times relevant, was a nonstock, nonprofit corporation organized under the

laws of the State of New Jersey (Docket Entry 14, Amended Complaint ¶ 5[7]).  Pamrapo is a

banking association organized under the laws of the United States of America with its principal

office in Bayonne, New Jersey.[8] *Ibid*.

The parties had a business relationship for several years.  "Bayonne Hospital,"

predecessor to the debtor as "BMC," opened a checking account at the bank in 1998 (Dkt. 32,

Certif. of Margaret Russo, Vice President of Lending at the bank, ¶ 2).  Its wholly owned

subsidiary, the Bayonne Medical Center Foundation, opened a checking account at the bank in

1999.  *Ibid*.  BMC business with the bank increased in 2005.  The debtor opened payroll

checking accounts in February and April 2005 and another checking account in April 2005

(Russo Certif. ¶ 3).

In 2005-6 the following individuals had affiliations with both the debtor and the bank:

| | |
|---|---|
| Herman L. Brockman | Chairman of the debtor's Board of Trustees for about fourteen years; member of the debtor's Board of Trustees for about twenty-five years; since March 2005 a member of the bank's Board of Directors |

---

[7]Citations to docket entries (hereinafter "Dkt.") refer to the adversary proceeding docket unless otherwise stated.

[8]The bank is also said to be a corporation organized under the laws of the State of New Jersey, according to the Certif. of Richard E. Sosnowski, Mortgage Servicing Officer, submitted in support of a bank lift stay motion filed on July 27, 2007 (Main Case Dkt. 453, ¶ 1).

|  |  |
|---|---|
|  | (previously on the bank's Advisory Board); owner of bank shares valued at over $200,000 at times relevant to the Complaint[9] |
| William Campbell | President, CEO, director and largest shareholder of the bank; Treasurer and member of the debtor's Board of Trustees; Chair of the debtor's Finance Committee |
| Ted Garelick | Vice Chair and Secretary of the debtor's Board of Trustees; member of the bank's Advisory Board |
| William Finnerty | Member of the debtor's Board of Trustees; maintained his attorney business and trust accounts at the bank; did some legal work for both BMC (Finnerty Tr. 10:15-23) and the bank (*id.* at 14:20-15:5).[10] |

**The February 2005 Unsecured Line of Credit**

BMC first borrowed from Pamrapo through a Revolving Credit Note and a Loan Agreement dated February 28, 2005 (Russo Certif. ¶ 4 and Ex.1). The loan provided a $2 million line of credit due July 1, 2006, with monthly payments of principal and interest at variable prime rate. The Loan Agreement, though labeled "Secured Line of Credit," identified no collateral and apparently was simply documented on the wrong form.[11] The loan, in fact, was

---

[9]*See* Plaintiff's Amended Statement of Undisputed Material Facts in Further Support of Motion for Partial Summary Judgment, Dkt. 31, ¶¶ 12-13. *See also* Brockman Tr. I 31:15-35:24.

[10]Other individuals relevant to this proceeding are: Robert Evans ("Evans"), President and CEO of the debtor from December 2000 to about October or November 2006 (he tendered his resignation to Brockman on October 9, 2006 and stopped going to the debtor's facility no later than the end of November 2006) (Evans Tr. 11:8-24; 69:10-70:23); Heather Aaron ("Aaron"), CFO from 2004 (Aaron Tr. 10:15-21) to June 2006 (Mohrle Tr. 15:4-19); Paul Mohrle ("Mohrle"), Director of Finance from August 2004 until he became acting CFO in June 2006 after Aaron left (Mohrle Tr. 14:2-15:19); and, Daniel J. Massarelli ("Massarelli"), Chairman of the Board of Directors of the bank from 1987 to present (Massarelli Tr. 25:2-20).

[11]The bank had not been making unsecured commercial loans at the time it provided BMC with the line of credit; the hospital's loan was the largest such loan in the bank portfolio. *See* Campbell Tr. 63:25-65:9; Massarelli Tr. 31:19-37:8; 50:3-22-51:5; Russo Tr. 29:7-21.

7

unsecured.  Aaron, as BMC CFO, initially broached the subject of a loan with William Campbell

at a debtor's Board meeting or a Finance Committee meeting (Campbell Tr. 39:13-40:25; Russo

Tr. 32:5-33:9; 66:4-14).  BMC borrowed the money to address cash flow problems and to obtain

working capital (Evans Tr. 11:25-12:22; Campbell Tr. 39:17-40:5).  Loans from other

institutions were apparently unavailable (Aaron Tr. 20:13-22:9).  ("We had no collateral to

give."  Aaron Tr. 21:24-25.)  *See also* Campbell Tr. 50:5-6 ("[I]f the hospital needed the

situation, who else would step up?").  As evidence of the bank's willingness to "step up" for the

benefit of the community hospital, though Campbell gave Hughes, the bank's accountant, the

debtor's 2003 audited and 2004 unaudited statements as part of the BMC loan approval process,

the bank may have approved the loan before Hughes completed his review of them (Campbell

Tr. 43:11-52:25).[12]

---

[12]*See* Massarelli's testimony (answering why the BMC loan was not secured):

    A      The Bayonne Medical Center loan was a unique loan. It was a loan by the Pamrapo Bank, a community bank, to a community hospital, the only hospital in the city of Bayonne, probably 60,000 people, also one of the largest employers in Bayonne.  We considered the loan to the Bayonne Hospital part of our community duty and community service, which we did not consider the other loans in that category.

    Q      . . . Was the unique nature of this loan based upon a close relationship between the bank and the medical center?

    A      No.

(Massarelli Tr. 38:21-39:9).  *See also* Massarelli Tr. 132:4-8 (characterizing the relationship as being no closer than with other bank customers).

**The May 2006 Unsecured Line of Credit Transaction**

With the 2005 unsecured line of credit due to mature on July 1, 2006, in April and May 2006 BMC sought an extension of the term *and* an increase in the line. BMC was at that time plainly anticipating an $80 million bond issue through HCFFA which would have purportedly solved the hospital's tight money problems.[13] The bond proceeds were to pay off existing debt (including the loan from the bank) and to enhance surgical facilities (Aaron Tr. 28:25-30:11; 36:25-38:19).[14] A May 5, 2006 letter from Aaron to Campbell thanks Campbell for "processing our request" (Russo Certif., Ex. 2). The letter in pertinent part continues:

> Our 2006 debt financing plan consists of refinancing our long term and short term debt (which includes the Pamrapo Line of Credit) of approximately $52 million as well as $28 million additional debt to be used for upgrade to our surgical suites and Same Day Surgery Center and reimbursement for prior capital expenditures. In total we anticipate the new bond issue to be approximately $80,000,000.

---

[13]BMC applied to the Authority for the bond issue under cover of its letter of April 7, 2006, which provided as follows:

> Enclosed is our check for $45,000, the MOU [Memorandum of Understanding] and the Financing Questionnaire.

> We look forward to working with The Authority in regards to our bond refinancing.

> Please let me know what our next steps should be. We are looking to complete the bond financing as soon as possible.

Dkt. 6, Hammonds Certif., Ex. F, PSB0196-PSB0244.

[14]Aaron explained that the debtor's application to the Authority (elsewhere called a "memorandum of understanding") was in its preliminary stage in April 2006 (Aaron Tr. 35:6-17). The Authority's "preapproval" of the debtor meant that the debtor was cleared to proceed with its application (Aaron Tr. 38:20-39:16). Bond proceeds would pay off the existing bond debt of $42-$43 million and the bank's loan (Aaron Tr. 36:25-38:19).

9

> We have been pre-approved by the New Jersey financing authority
> and expect to close on this new financing in approximately four
> months. We have selected Raymond James as our investment banker
> who will provide us with the necessary assistance and expertise
> through closing on this financing package.

Campbell recalls that "someone" from inside the hospital advised him after a Board meeting that BMC sought an extension of the $2 million line of credit (Campbell Tr. 66:20-69:3 and 69:14-70:18). He surmises that Evans spoke to him but does not particularly recall their meeting (Campbell Tr. 68:5-69:20). He recalls that "Heather Aaron or somebody like that" sent a letter to the bank, *included the HCFFA submission*, and requested an increase in the line of credit to $5 million (Campbell Tr. 66:20-67:19). In her letter to Campbell of May 9, 2006,[15] she says: "Full payment will be made to Pamrapo Bank when the bond financing is completed, and interest payments will be made until such time." *See also* Campbell Tr. 92:15-23 (Campbell responding to whether the bank thought in May 2006 that the bank "had the ability to be repaid"): "Of course. If this bond could have been refinanced for 80 million–we're talking

---

[15]Hammonds Certif., Ex. F, PSB0195 (annotated) and PSB0196, which in full form provided as follows:

> This is to clarify the questions from Margaret Russo regarding
> Bayonne Medical Center's (BMC) request for an increased line of
> credit from $2 million to $5 million.
>
> Attached, for your information, is a copy of the memorandum of
> understanding between BMC and NJHCFFA. Full payment will be
> made to Pamrapo Bank when the bond financing is completed, and
> interest payments will be made until such time. Raymond James, the
> investment banker, has been accepted to represent BMC and the
> transaction has been approved by the BMC Board of Trustees.

10

about $80 million of course.  Probably two million would have been paid, and they would have

kept a million as a line of credit for their daily operations, their overdrafts."[16]

Some seven weeks before the July 1, 2006 maturity date of the first BMC-Pamrapo loan,

the loan was recast.[17]  The bank increased the debtor's line of credit to $3 million (*see* Russo

Certif., Ex. 3 Loan Agreement and Promissory Note dated May 12, 2006).

The loan term was extended to November 15, 2006.[18]  It was to be paid on an interest

only basis and then repaid in full, presumably from bond proceeds.  Indeed, Pamrapo believed in

April and May 2006 that the groundwork for the huge HCFFA bond issue had been developed.[19]

---

[16]*See also* Brockman Tr. II 288:19-289:17.

[17]The May 2006 credit line increase was approved by the bank board at a meeting of
April 25, 2006 (actually authorizing a $5 million line later reduced by the bank credit
committee).  *See* Massarelli Tr., Ex. 1.  BMC ratified same at its June 8, 2006 meeting.  *See*
Brockman Tr. I, Ex. 17.  Though conceded to be of great benefit to the hospital, the plaintiff
points out that neither meeting minutes reflect recusal of Brockman and Campbell.

[18]The Promissory Note expressly provided that "[b]orrower may pay without penalty all
or a portion of the amount owed earlier than it is due."

[19]In her Underwriting Memorandum to Campbell of May 11, 2006, Margaret Russo
stated the following:

| | |
|---|---|
| Loan Request: | Increase in the credit line by $3,000,000 for a period of 120 days |
| Purpose: | Cash flow until restructuring of debt. Bayonne Medical Center is anticipating a new bond issue of $80,000,000 which would satisfy existing long term debt and provide approximately $28,000,000 toward the purchase of a Staten Island hospital and new equipment. |
| Financial Statements: | Reviewed at a meeting of William Campbell, Patrick Conaghan, Robert Hughes and Margaret Russo.  *The center is solvent with net assets of 36.5 million*. [Emphasis added.] Cash and investments as of year end were |

11

Pamrapo also became aware at some point[20] of the potential for *bond-related* funding through a

Nuveen underwriting of bond anticipation notes.  Campbell first testified as follows:

> Q      Did there come a point in time when someone at Bayonne Medical Center contacted you to increase the line of credit from two million – or contacted you to increase the line of credit?
>
> A      Yes.
>
> . . .
>
> Q      And what would be in this application, what type of information would be provided by the hospital?

<div style="border-top: 1px solid black; width: 30%;"></div>

| | |
|---|---|
| | approximately $19,000,000.  The nature of the business, most particularly the amount and time frame of payments by Medicare, Medicaid, insurance companies, etc. creates a regular and significant cash flow problem.  That is evidenced by the review of the ratios provided by the hospital. |
| Risks: | There is always inherent risk in any transaction but based upon the operation of the entity, the commitment of the community to retaining and supporting the hospital, the cash position, and the administration, risk is considered low. |

> As discussed, approval is for an additional $1,000,000 to be satisfied in full when the bond transaction is settled.

Hammonds Certif., Ex. F, PSB0194.

[20]Precisely when the bank became aware of the possibility of the note underwriting by Nuveen is not as clear as the linkage between the HCFFA bond application and the 2006 loan extension.  At least one BMC trustee besides Campbell (to the extent he has) tied the Pamrapo repayment to the Nuveen funds.  Mill Tr. 61:8-63:23; 106:7-107:5.  The plaintiff through counsel at oral argument challenged that trustee's recollection (without reciting an authoritative counterpoint), and appears to dispute Pamrapo's reliance on Nuveen money for repayment of the May 2006 loan.  For purposes of admeasuring the bank's motion for summary judgment, the court will assume that the Nuveen money was not *per se* a factor when the extension and increase was granted by Pamrapo.

A        *The hospital – that this was going to be a short-term loan, and the loan was going to be taken out by the bond financing.*  And here is the record – this is the agreement we have with the state, and the broker is going to be Raymond James.  All that was included.  (Emphasis added.)

Q        And in your capacity as treasurer of the hospital, were you involved in the decision to request an increase from two million to five million?

A        No, I wasn't involved with it.

Q        Why weren't you involved?

         . . .

A        That's done by the operating people.  They're the people that run the hospital, the same as the employees of the bank run the hospital.  It's not done by – it wasn't done by anybody else.

Q        So nobody consulted you as the treasurer to say that the hospital needed additional financing?

A        Yes, they did.

Q        When did they do that?

A        I don't remember.

Q        But –

A        *But they said that they have the loan coming from Nuveen and we're going to need this for just a couple of months*, might have been the CEO, might have been the chief financial officer, it could have been the chief financial officer's assistant.  No, a lot of people could have been involved.  (Emphasis added.)

         . . .

Q        *And by May of '06, what is your understanding of the hospital's finances?*

A        *That they were going to get the 10 million from Nuveen.*

Q        *Not the $80 million bond, only $10 million?*

A        *The bridge loan.  And then in November, I think it was November – December, the bond was going to be issued at that time.  These dates had changed.  In May, we were expected to have done all the refinancing, May to June.  That never happened.*  (Emphasis added.)

Campbell Tr. 66:20-71:4.

13

Campbell subsequently made the following ambiguous comments about the Nuveen

money:

> Q     *Was Nuveen money available in the spring of '06?*
>
> A     *No, but it was coming due. The application was made for it, and I believe Raymond James set up the situation where Nuveen would come in and make the bridge loan till they were ready to settle the deal.* (Emphasis added.)
>
> Q     That didn't happen until the fall?
>
> A.    Right.
>
> Q.    So then –
>
> A     But it takes time to do these things. You just don't give – somebody doesn't – Raymond James has to arrange with Nuveen and they have to do all the underwriting, everything else.
>
> Nuveen has to come in and do all the underwriting, check all the documents they had and everything else. How long does it take, I don't know, but certainly months.
>
> Q     By the spring of '06, was the hospital looking for the 10 million from Nuveen or the $80 million through HIPAA?
>
> A     They were looking prior to that for the $80 million. When – the deal was supposed – by the spring of '06, the whole thing should have been done, the whole refinancing should have been done. The hospital would have got $80 million bond issue approved, insured, and off we would have went.
>
> Q     But the hospital didn't apply to the state –
>
> A     They did.
>
> Q     – for HIPAA until April of '06?
>
> A     Oh, no. I don't have the exact date they applied but I'm sure it was much sooner than that, prior to that.
>
> Q     And when do you think the hospital went to Nuveen to get money?
>
> A     *Probably – no, they didn't go to Nuveen. The broker of record was going to be Raymond James. I believe Raymond James, when he seen the situation, arranged for Nuveen to come in and do the bridge loan. Two different entities.*
>
> Q     *And when did that happen?*

14

A    *That happened in the months prior to what we're talking about now, probably June, July, August, September.*

Q    *After Pamrapo decided to increase the loan from two million to three million?*

A    *Yeah.*

Q    *So when Pamrapo increased the loan, you were trying to get – was Pamrapo trying to get paid from the 80 million or the 10 million?*  (Emphasis added.)

A    We would have took it from anyone.

Q    I understand, but –

A    I can't understand your reasoning for this question, because, you know, I've told you so many times that the $80 million was – we were looking for it and it was supposed to come by June.

     June was supposed to be – we wouldn't have needed a dime if everything was on schedule with the bond refinance.  It all would have been taken care of. Everything would have been done.

Q    So then why did the hospital go – let me finish.  *Why did the hospital go to Pamrapo in May to increase the loan –*

A    *Because they didn't get the money from Nuveen yet. That was going to be the bridge loan between our loan and the bond refinancing.*  (Emphasis added.)

Campbell Tr. 86:5-88:21.

Campbell unambiguously tied the May 2006 loan increase to the ongoing bond

application process as follows:

Q    So how did the loan increase from two million to three million, who did you have the conversation –

A    They sent the application plus the documents that they had the deal with the state and they had this deal with Raymond James.  I mean – I mean, these documents look like it was the real thing.  We had a deal and then we didn't.

     I mean, when they can – you know, Nuveen and Raymond James, we're talking about big time – this is the field they deal in every day.  I mean, I was over my head with this type of thing.

Q    What do you mean you were over your head?

15

| | |
|---|---|
| A | Those guys are used to dealing with these numbers and with these type of people.  How many hospitals do you think Raymond James would do a year, how many hospitals that Nuveen would do a year, hundreds. |
| Q | So you were over your head as treasurer of the hospital? |
| | . . . |
| A | Well, if I had good information, I wouldn't have been over my head. |
| Q | When you increased – when Pamrapo increased the loan from two million to three million, was there a source of repayment other than the bond financing? |
| A | They still had shown operations they were breaking even. |
| Q | They continued to cash flow negative.  Right? |
| A | And negative cash flow probably for two years, maybe more. |
| Q | So by May of '06, you thought – you thought – did Pamrapo believe that it had the ability to be repaid? |
| A | *Of course.  If this bond could have been refinanced for 80 million – we're talking about $80 million, of course.  Probably two million would have been paid, and they would have kept a million as a line of credit for their daily operations, their overdrafts.* (Emphasis added.) |

Campbell Tr. 91:6-92:23.

## **The Nuveen Loan Closing and the $1,000,000 Payment to Pamrapo**

On August 10, 2006 the debtor's board authorized the hospital to borrow up to

$10 million in "bond anticipation financing" to be used "for reimbursement of prior capital

expenditures and additional capital acquisition" to be repaid "at the closing of the bond issue

currently scheduled for October 2006" (Dkt. 31, Panzer Certif., Ex. T, Resolution and Minutes of

August 10, 2006 Board meeting).  Evans explained that the debtor sought this financing for

"working capital to in effect bridge the hospital until the permanent long-term financing was in

16

place" (Evans Tr. 38:3-5).  Paul Mohrle understood that the $10 million bridge loan was to

"jump start" the capital improvements project which the debtor wanted the Authority to fund

("the money from the [Nuveen] loan–*part of those monies* were going to be used to start that

process prior to getting the funding from the Authority," Mohrle Tr. 53:15-55:13, particularly

55:10-13) (emphasis added).  Brockman understood the Nuveen loan to be "[a] bridge loan until

the bonding came in" (Brockman Tr. II 269:6-8).  Debtor's attorney Robert S. Burney in an

August 15, 2006 e-mail to Mohrle opined that the debtor could borrow the $10 million bridge

loan under the existing bond covenants *provided that the proceeds were used for working capital*

(Brockman Tr. II 269:13-274:22 and Brockman Ex. 27).[21]

By letter of October 6, 2006 Margaret Russo of the bank advised acting CFO Paul

Mohrle that the line of credit would mature on November 15, 2006, the debt was due and

payable at that time, and that a payoff statement would be sent in advance of that date.  The

letter, issued some forty days before maturity but only five days before the Nuveen closing stated

that the then *current principal balance* of the loan was about $2,950,806 (Mohrle Tr. 66:15-67:9

and its Ex. 7, PSB01440).  The Nuveen loan for $10 million closed on October 11, 2006 with

funds wired to BMC on or about October 12 (Mohrle Tr. 78:17-79:21).

Mohrle had previously provided a certification, later the subject of deposition questions,

where he stated that on or about October 13, 2006 Brockman appeared at his office and directed

him to issue a check to the bank in the amount of $1 million (Mohrle Tr. 78:25-80:9).  Brockman

testified that he was in Nevada and California from October 6, 2006 to October 20, 2006, and

---

[21]The plaintiff challenges the use of Nuveen proceeds to, in part, pay down the Pamrapo
loan, arguing that the BMC resolution did not provide for same (notwithstanding the plain
language of "reimbursement of prior capital expenditures" and hospital counsel's advice).

that he had the travel documents to prove his absence (Brockman Tr. II 277:13-278:9).

Challenged with Brockman's absence, Mohrle insisted that the encounter took place, perhaps

before the Nuveen closing (Mohrle Tr. 80:10-81:21). Mohrle says he thought at the time that the

debtor should not issue a check to Pamrapo because other creditors were clamoring for payment;

Mohrle claims to have said something to Brockman to the effect that the debtor should not make

this payment (Mohrle Tr. 102:19-105:23). Mohrle did not consult with Evans on this issue; in

fact, Evans was said to have been unavailable (Mohrle Tr. 103:6-20). Russo says the debtor

"issued" the bank a check for $1 million on October 13[22] (Russo Certif., Ex. 4). Mohrle said that

Evans' name was preprinted on the check, and that Mohrle signed it "to make it negotiable"

(Mohrle Tr. 76:8-78:7).

Campbell's take on the circumstances of the October payment is as follows:

> Q    Right. Did you ask to be repaid?
> A    Sure. I said, why are you giving me a million dollars,
>      give me the three million. They said, oh – because I
>      knew they had the 10 million. We have to earmark
>      this for certain things, we have to – it was a song and
>      dance.
> Q    So this is in October when – this is when they got the
>      Nuveen money. Right?
> A    Yeah.
> Q    *So you asked to get repaid the full amount at the time*
>      *the Nuveen money came in?*
> A    *Right. Now, we asked for – we – it was understood*
>      *that they would pay us. I didn't go asking them. I*
>      *thought everything was fine. I didn't go say, you*
>      *better give me my money, I didn't do that.*
>      *I thought – I still thought everything was fine. The*
>      *situation was in good shape. If I didn't, I would have*
>      *been over to Herman screaming for the money, see if*
>      *he could help me.* (Emphasis added.)

---

[22]A review of the check indicates it was dated October 13 and honored October 17, 2006.

18

Q       How would Herman help you?
A       He wouldn't.  He would help the hospital.
Q       How would Herman help the hospital?
A       By saying we need this money for all these different things. I mean, the hospital came first with Herman, believe me, the hospital came first.
Q       So it would help the hospital by getting Pamrapo paid. Right?
        . . .

A       To get Pamrapo paid, I wouldn't know that.  I would have to say – wait a minute.  We're getting confused here.  Here's the confusion.  The hospital owed the three million.  Right?
Q       Uh-hum.
A       They paid me a million and there was two million still due.  Now, I know they received 10 million.  I said, why don't you pay me the whole three million or pay me another million.  Is that an unreasonable request? Who does that help, I don't know.
Q       But you knew about the 10 million coming in because of being a treasurer.  Right?
A       Yes.
Q       And the head of the finance committee?
A       Yes.
Q       What was the hospital doing – what was the hospital's plans for the 10 million?
A       They had a plan.
Q       And what was that plan?
A       I can't recall that, but it was so much was going to be for capital improvements, so much was going to be for this, so much for that, and there's only a million dollars left to pay you.
Q       *And did you push back and say, well, pay me my three out of that and push off some of the other stuff?*
A       *I wish I did that.  That would have been the smart thing to do.*  (Emphasis added.)
Q       Well, did you have any negotiations about how to get more?
A       No.  I still thought that everything was fine.  They don't pay me this month, I'll get it next month.
Q       So you weren't worried?

19

A I wasn't worried, no.  If I was worried, I might have done things different.  I probably could have got the money, at least a million of it.

Q By calling Herman?

A No.

Q How would you have done it?

A Going over there and telling them, you have this money, pay me first, but I didn't do that.

Q You had –

A I didn't even ask for the one million.  They gave me that.

Q *You had the ability to do it.  Right*?

A *I had the ability to do it, sure.  I didn't do it. Remember, we're getting $80 million next month, month and a half, the recasting of the bond, if you're to believe what we were led to believe.*  (Emphasis added.)

Campbell Tr. 96:9-99:21.

### BMC Default; Mortgage Given To Pamrapo

By letter of November 27, 2006 to Mohrle's attention from the bank's Richard E. Sosnowski, notice of loan default and demand for payment was made by Pamrapo.  (Russo Certif., Ex. 5).  The letter states a payoff amount of $1,938,046 as of November 30 (reflecting the $1 million October pay down) and bears the handwritten notation "faxed & mailed 11-28-06" (Russo Certif., Ex. 5).

At a November meeting of the board of the bank Massarelli excused Campbell and Brockman to discuss the debtor's default on the loan (Campbell Tr. 103:25-104:23).  It was reported that the debtor sought an extension of the loan; however, the bank would agree to the extension only if the debtor secured the debt (Campbell Tr. 104:24-105:24).  The bank, in seeking collateral for the loan, focused on certain BMC real property not restricted by bond covenants (Campbell Tr. 117:8-119:19).

To Massarelli's recollection, Campbell had raised the matter of loan collateral in mid-November 2006.  Campbell identified the properties (Massarelli Tr. 217:8-218:22; 222:19-223:7; 226:4-24).  Massarelli said that the bank had an appraisal done, he assumed between November 15 and December 6 ("[W]e had a document with the dates," Massarelli Tr. 219:11-24).  According to Massarelli, Campbell did not discuss how he knew that the bank could obtain the mortgage from the debtor (Massarelli Tr. 223:8-21).  Massarelli could remember no negotiation between the bank and the debtor about the collateral; he acknowledged that the bank extended the loan on terms proposed by Campbell.  Massarelli Tr. 231:18-232:1.

The BMC trustees convened in a watershed meeting on December 7, 2006. Twelve trustees and five guests attended (Hammonds Certif., Ex. F, PSB0046-51).[23]  According to the December 7, 2006 minutes, Brockman, under "Chairman's Report–Financial Update," informed the board that BMC was in "a more severe financial position than initially anticipated"; that the deficit represented by short term debts totaling $40 million meant that there was "no possibility" that the bond refinance would go through; and that BMC should consider notifying its bond insurers (for the existing $42-$43 million of outstanding bonds) of these facts. Hammonds Certif., Ex. F, PSB0046.

Eventually, Brockman called the trustees to an executive session at which the issue of collateralizing the Pamrapo loan was raised.  "Guests," including Mohrle and other staff, were excluded (Brockman Tr. II, 299:21-300:3).  The board minutes reflect this as follows:

> While in executive session, discussion occurred regarding Pamrapo
> Bank's willingness to extend the repayment date relating to its

---

[23]The plaintiff has produced depositions for six board members and two guests.

21

> $1,939,000 line of credit on the condition that the bank would receive
> a mortgage on certain BMC properties.

Hammonds Certif, Ex. F, PSB0048. In fact the following resolution authorizing the mortgage

transfer was adopted:

> BE IT RESOLVED that the Board of Trustees of Bayonne Medical
> Center approve and authorize the execution of a mortgage in
> connection with the agreement of Pamrapo Bank to postpone the date
> for repayment of a certain loan in the approximate amount of
> $1,939,000.00. This loan extension is secured by mortgage on the
> following parcels of land owned by Bayonne Medical Center
> [describing real property].

Hammonds Certif., Ex. F, PSB0050.

Brockman did not believe that Campbell raised the subject of the resolution and has

insisted that Campbell and he only answered questions asked of them on the subject (Brockman

Tr. II, 304:5-305:21). In any event, the minutes reflect abstention by Trustees Brockman,

Campbell, Garelick and Dedousis (Hammonds Certif., Ex. F, PSB0048) and affirmative votes for

the resolution by the balance of eight trustees. Trustee Dugan, however, indicated that the

minutes are incorrect; she says she too abstained (Dugan Tr. 74:2-23). There were no negative

votes. Loan terms included extension of the previously defaulted balance to June 1, 2007 (Russo

Certif., Ex. 8, Promissory Note dated December 8, 2006). There was no professional advice

offered at the December 7 executive session (indeed, no professional advisor was present),

particularly as to granting the mortgage to Pamrapo, and more generally as to the subject of

bankruptcy which was, in fact, the context in which the transfer of collateral was addressed.

Finnerty Tr. 60:5-17; 66:6-15; 67:1-14; 68:5-11; 68:21-69:21; 70:8-71:1; 74:2-9; Dugan Tr.

78:13-17; 102:12-17; 110:2-111:11; Dedousis Tr. 55:24-57:17; 65:15-18 and Dkt. 31, Certif. of

John Dedousis, M.D.,¶ 8.

Besides Brockman's statement of the drastic financial condition of the hospital, the

December 7 meeting minutes reflect Campbell's treasurer's report of a $16 million loss in

October 2006 (Hammonds Certif., Ex. F, PSB0047).  Campbell says it was Mohrle who actually

gave this report (Campbell Tr. 144:6-145:11).  In any event, Campbell expressed shock at the

downward turn of the finances.  He had been receiving monthly financials which showed a $2

million loss for the third quarter ending October 2006 (Campbell Tr. 145:12-145:21).  He said

that he had no reason to disbelieve Mohrle's much more negative report (Campbell Tr. 145:7-11

and 146:21-25).  Campbell and other witnesses indicated that the desperate state of BMC's

finances came to light after hospital CEO Evans had left:

> [W]e were blindsided by–by the CEO walking away.  We were
> blindsided by not having a deal, and then all of a sudden, we realized
> that they were cooking the books.

Campbell Tr. 130:23-131:1.  *See also* Dugan Tr. 72:13-73:12 and 103:9-16 (stating that the

December 7 meeting was contentious because the CEO had left and the deficit had gone from $2

million to $16 or $40 million, a change which she described as "the sudden explosion of amount

owed").  *See also* Dedousis Tr. 39:19-43:5 (complaining that Evans' "verbiage" painted a rosy

financial picture and that the "abbreviated" monthly financial statements always looked fine);

Dedousis Tr. 71:25-73:3 (complaining that Evans raised the granting of the $10 million Nuveen

loan as evidence that BMC was financially healthy); and Dedousis Tr. 91:21-25 (surmising that

Campbell "was duped by Rob Evans like we were all duped by Rob Evans").

Campbell reported that in late November or early December 2006 Massarelli, on behalf

of the bank, commiserated with Campbell for having extended the loan in May, telling Campbell

that he (Massarelli) would have done the same thing (Campbell Tr. 150:4-151:10).  Campbell

says that he was "blamed" when the loan "went bad" (Campbell Tr. 150:19-22).  The bank had

established a loan loss reserve for it in late November or early December 2006 (Campbell Tr.

151:21-153:20).  Asked why the bank did not need collateral in May 2006 but did in December

2006, Campbell summarized the bank's change in posture:

> A    The money was coming in from Nuveen, 10 million, which
> came. . . .  Now we know there's no more 10 million coming.
> There's no money coming from the bond thing.  *Everything
> changed. . .*
>
> Q.   How do you know everything has changed?
>
> A    Because there is no bond deal.
>
> Q    So the money in May was only provided because of the bond?
>
> A    Of course.
>
> Q    And when that dried up?
>
> A    That's the end.  The game is over.

Campbell Tr. 127:24-128-11; *see also* 123:5-25 (emphasis added).

Campbell testified that Pat Conaghan, an attorney on the bank board promoted the idea of

collateralizing the loan (Campbell Tr. 117:8-118:21).  Campbell said that "[w]e asked for these

loans to be collateralized . . . [w]e asked it and they gave it.  There was no demands taken"

(Campbell Tr. 120:10-20) and, "[i]f they gave it to me, they gave it to me; if they didn't, I would

have walked out the door without it" (Campbell Tr. 125:2-4).  Campbell testified that he said

very little at the December 7, 2006 BMC board meeting, answered questions and made "no

threats" about taking remedies under the loan (Campbell Tr. 121:9-122:13).

Finnerty does not recall who raised the issue of collateralization at the December 7, 2006

BMC board meeting:

24

> [Campbell] may have spoken as to why they were looking to
> collateralize the loan. . . . I think, had we not done it, we were facing
> the possibility of having that, the line called.    And we couldn't,
> weren't in a position to make any payments on that line.

Finnerty Tr. 48:6-14.  The board was trying to keep the hospital open as long as possible

(Finnerty Tr. 49:21-50:2; 58:4-11; 58:15-21).  Finnerty, when asked how the BMC board

determined that the bank was the one (then) unsecured creditor which had to be accommodated,

replied:

> I think it wasn't specifically that Pamrapo could close the doors.  It
> was in a more global sense that, given the financial position that the
> hospital was in, if we had one other lender that would literally force
> us to the brink of bankruptcy by calling a Note, because then we
> would not have had the opportunity to continue to operate as an acute
> care hospital.  And it may have forced us into a position of having to
> file bankruptcy sooner than we anticipated.

Finnerty Tr. 67:1-14.  Finnerty reiterated this perception:

> I think the only thing that we were advised is that Pamrapo, because
> we were in default, *could have called the line of credit, forced our
> hand, brought us to the bankruptcy a lot sooner than we anticipated*,
> because we were trying to stave off this happening.

Finnerty Tr. 68:5-11 (emphasis added).

> And we just felt that this was one vendor, one lender, that we'd stave
> off and push back and then give us some more time to get to do what
> we had to do and try to save the hospital.

Finnerty Tr. 69:15-18.

There was no discussion about whether the bank's line could be paid in the next three to

six months if the extension were granted (Finnerty Tr. 73:18-75:14); and Finnerty recalled no

discussion of any alternate scenario if BMC refused to collateralize the bank's loan (Finnerty Tr.

77:3-24).

Dugan testified that Campbell and Brockman remained in the room and participated in

the discussion about securing the loan (Dugan Tr. 71:9-16):

> I don't remember exactly what they said, *but they felt it was*
> *appropriate and the right thing to do, because [of] the generosity of*
> *the bank and they felt it was appropriate*.  (Emphasis added.)

Dugan Tr. 71:18-21.  Although Dugan did not clearly recall Campbell's statements about the line

of credit,

> the feeling in the room was that he was a respected member of the
> board and had been very generous to the hospital.  And I think there
> was some concern about the fact that the hospital's condition was
> such and that Pamrapo also was owed money.

Dugan Tr. 67:14-24.  Brockman voiced that concern:

> I think he talked about the fact that they could pull the loan and then
> ask for the money back immediately and that would be a problem.

Dugan Tr. 67:25-68:9; *see also* Dugan Tr. 90:25-91:14.  Dugan reiterated a sense in the room

that the loan required immediate repayment:

> I think everybody felt that the line of credit would have to be paid
> immediately and that's why this action had to be taken.

Dugan Tr. 105:23-106:1.  Dugan considered granting the mortgage to be inappropriate, given the

lack of information and certain board members' conflicts:

> I didn't think enough information was known with regards to our
> financial condition and I thought it was possibly inappropriate
> because there were people sitting on the two boards in the room.

Dugan Tr. 70:20-71:6; 108:8-21; 124:5-12.  No one at the meeting mentioned whether BMC had

obtained advice of counsel (Dugan Tr. 76:2-8).  No one explained how a six-month extension of

the loan would help to avoid bankruptcy (Dugan Tr. 110:3-21).

Dr. John Dedousis, then president of the BMC medical staff and a BMC trustee, averred in certification and deposition that he believed the mortgage to be improper for several reasons (Dkt. 31, Certif. of John Dedousis, M.D., dated July 31, 2009, ¶¶ 9-17; Dedousis Tr. 59:21 ff). He stated unequivocally that it was Campbell who asked the BMC board to secure the Pamrapo loan with three parcels of property (Dedousis Certif., ¶ 9; Dedousis Tr. 59:21-60:5). According to Dedousis, Campbell said that the loan was in default and that he could call it immediately (Dedousis Tr. 63:12-64:2). Dedousis observed that calling the loan would have been ineffectual because BMC had no money to pay the debt (Dedousis Tr. 64:6-10 and 67:13-19). Dedousis believed that Campbell had a conflict of interest because he was on both boards (Dedousis Certif., ¶ 13; Dedousis Tr. 82:1-15). Dedousis apparently took Campbell to task as being privy to "inside information" about BMC's "dire financial situation," information to which no other creditor had access (Dedousis Tr. 67:20-68:7). Dedousis believed that Campbell reacted with frustration to Dedousis's December 7 questioning of the mortgage transfer. The following point was made about Campbell's and Brockman's influence:

> [W]hen things are good, there's no problem using influence.
>
> And I'm sure that loan was attained when–when he was under the impression that things were good and he was trying to use his influence as a board member and a member of Pamrapo to obtain a loan for our hospital. Okay.
>
> But then when things go bad, you know, here I am, the guy needling, saying you can't do that when times are bad and he wants some kind of payment back for the loan that he used influence probably to get. Okay. Now he can't use his influence to get some form of payment back. And I–I suspect that that was part of the frustration going on here.

27

And people like Bill Campbell as well as Herman Brockman did a lot
for the hospital.  And–and that loan is probably a perfect example of
what they did for our hospital.

Dedousis Tr. 88:16-19 and 89:8-90:1.  It was perceived that Brockman as chair rather abruptly

called for a vote, and, on the motion of Finnerty seconded by Mill, the majority of board

members voted in favor of the resolution to grant Pamrapo mortgages on three properties to

secure the existing loan (Dedousis Tr., 93:21-94:10; Dedousis Certif., ¶ 18 and Hammonds

Certif., Ex F, PSB0048).

On April 16, 2007 BMC filed its voluntary Chapter 11 bankruptcy petition.

## IV.    PRIOR RULING ON "INSIDER" STATUS OF BANK IN MORTGAGE TRANSFER

On December 29, 2009 this court ruled that the bank was an insider for the purpose of the

mortgage transfer initiated on and after December 8, 2006.[24]  It was found that the mortgage was

a voidable preference under 11 U.S.C. § 547(b) and a voidable transfer under the New Jersey

Fraudulent Transfer Act, N.J.S.A. 25:2-27(b).  Summary judgment was granted to the plaintiff

on Counts V and IX of the Complaint.  The ruling focused on the affiliation which four BMC

board members, William Campbell, Herman Brockman, William Finnerty, and Theodore

Garelick had with both BMC and the bank, and particularly on their conduct at the December 7,

2006 BMC board meeting.  (Dkt. 40, 12/29/09 Tr.102:24-107:22 and 110:5-25.)  This court

examined whether these trustees exerted influence which became undue influence on BMC to

---

[24]The initial mortgage, dated December 8, 2006, at first had a misidentification of the
property; it was amended by corrective mortgage of January 4, 2007; recording of the initial
mortgage was on December 11, 2006 and the corrective mortgage on January 5, 2007.  *See*
Russo Certif. Exs. 6 and 7.

grant the mortgage, or acted in such a manner as to render the transaction other than one at arm's length (12/29/09 Tr. 102:20-23).

The critical nature of the December 7, 2006 BMC board meeting was stressed by this court. It was a meeting at which Brockman disclosed BMC's financial crisis, including substantial debt and the failure of the anticipated bond refinancing (12/29/09 Tr. 110:1-25). More specifically (and as quoted by this court at 12/29/09 Tr. 111:10-16), the meeting minutes (Hammonds Certif., Ex. F PSB0046) reflect the following report by Brockman:

> Speaking frankly, he stated that even with a successful turnaround plan, other operational issues and major expenditures coming due in 2007 (i.e., monthly debt service, repayment of lines of credit, anticipation funding, and Accounts Payable) will all serve to have a draconian budgetary impact from which we may not be able to recover.

Campbell, as treasurer, reported a shocking loss of $16 million for October 2006 (12/29/09 Tr. 111:23-112:2). Bankruptcy was discussed as a real possibility.[25]  The executive session of the

---

[25]

> [T]he case was made to [the other BMC board members] that [not granting the mortgages] would create complete bankruptcy for the hospital immediately because they couldn't make payroll and Pamrapo could call the loan . . . .

Dugan Tr. 78:13-17; *see also* 102:12-17; 110:2-111:11.

> Had Pamrapo called the Note, that would have accelerated . . . our inability keep the place open. . . .

> I think the only thing that we were advised is that Pamrapo, because we were in default, could have called the line of credit, forced our hand, *brought us to the bankruptcy a lot sooner than we anticipated*, because we were trying to stave off this happening.  (Emphasis added.)

Finnerty Tr. 66:13-15 and 68:5-11; *see also* 60:5-17; 66:6-12; 67:1-14; 68:21-69:21; 70:8-71:1; 74:2-9. Dr. John Dedousis, then president of the BMC medical staff and BMC board member,

BMC board was called, staff members, including acting CFO Mohrle, were dismissed; and

Campbell and Brockman promoted the mortgage to the other ten trustees, including Finnerty and

Garelick.  Bank board member Conaghan had apparently prompted Campbell to seek the

mortgage.  *See* 12/29/09 Tr. 112:10-113:12, 114:22-24.

    This court's opinion emphasized:  the failure of the four bank-affiliated BMC board

members to withdraw from the discussion (12/29/09 Tr. 113:9-12); the lack of exploration of

alternatives, including better use of BMC's last unencumbered asset; the absence of counsel for

BMC (12/29/09 Tr. 114:9-21); and, the lack of any program or capacity for BMC to repay the

loan at the end of the six-month extension which the mortgage bought (12/29/09 Tr.

113:23-114:2 and 119:22-120:8).  BMC board member Dugan (who with Dr. Dedousis

questioned the mortgage transaction) recalled Brockman saying "'it would be appropriate and

the right thing to do because of the generosity of the bank'" (12/29/09 Tr. 112:14-23).  It was

also noted that Finnerty explained that BMC's granting the mortgage was fueled by fear that the

bank would terminate the line of credit, already in default, and create an immediate bankruptcy

(12/29/09 Tr. 113:14-21).

    This court viewed the action at the December meeting as "a bum's rush to favor a local

bank promoted by board members, at least four of them who had conflictual interests, and

particularly Brockman and Campbell, but also Garelick and Finnerty.  Finnerty did not abstain

[from the vote]" (12/29/09 Tr. 115:4-8).  It was thus found that the conduct of BMC's

---

referring to the December 7, 2006 BMC board meeting, said that "the idea [of bankruptcy] was
brought up that it would have–that would be a consideration and a possibility" (Dedousis Tr.
55:24-57:7; *see also* 65:15-18); he also said "[t]he possibility of bankruptcy was specifically
discussed" at that board meeting  (Dkt. 31, Certif. of John Dedousis, M.D.,¶ 8).

bank-affiliated board members in the December 7, 2006 BMC board meeting, particularly the

conduct of Campbell and Brockman, in *the context of looming bankruptcy*, generated influence

amounting to undue influence which destroyed the arm's length character of the mortgage

transaction (12/29/09 Tr. 115:9-116:4).  The bank board wanted the mortgage but should not

have obtained it with the four "clearly conflicted trustees," Campbell, Brockman, Finnerty and

Garelick, being in the BMC board room on December 7, 2006 (12/29/09 Tr. 117:4-17).  The

court also acknowledged that the mortgage transaction may well have been timed to place it

outside the eventual ninety-day preference period (12/29/09 Tr. 117:20-118:1 and 120:13-16).

The mortgage was "the quintessential insider preference," saving the affiliated and friendly bank

"from a $2 million loss on an unsecured lien by granting it that last bit of asset available at that

last moment in time without any further thought about obligations to vendors, bondholders and

others" (12/29/09 Tr. 118:2-11).  Though the bank had the right to ask for repayment, it could

not so manipulate the BMC board process, taking collateral while BMC was "*clearly in the zone

of insolvency contemplating bankruptcy*" (12/29/09 Tr. 119:3-9).  Summarized, the factual

defects surrounding the transaction were as follows:

> [T]here was no negotiation for this transaction, there was no
> independent advice provided the board, there was no way to
> neutralize the influence of Brockman and Campbell and Garelick and
> Finnerty, there was no objective rationale for the transaction.  There
> was no mechanism by which there would be a payback.  There was
> no rationale for the six month extension.  There was no consideration
> of other creditors similarly situated and the hospital mission.  And
> there was no consideration of the best use of this last said to be
> unfettered asset. There was financial disclosure on 12/7 to which
> Pamrapo was privy and the world wasn't.

12/29/09 Tr. 119:23-120:9.  It was concluded:

The obligations of the board were thus different as insolvency was on the horizon and friendship and earlier generosity of the bank could no longer carry the day.  Perhaps it carried the day with the million dollar repayment, but this was an insider transaction which was not an arms length transaction.  It was a transaction that was concluded in favor of Pamrapo which was in a position through its knowledge of the inside of the financial circumstances of the hospital through the chairman of the finance committee of the hospital who was also CEO of the bank and that inside information as well as the undue influence of conflicted trustees gave Pamrapo an unfair advantage over general unsecured creditors similarly situated.

12/29/09 Tr. 119:10-21.

## V.  CURRENT MOTIONS

### A.  Standard of Review; Burdens; Relevant Evolution of § 547.

The granting of summary judgment is proper if there is no genuine issue of material fact, and when viewing the facts in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Ibid.  See also Josey v. John R. Hollingsworth Corp*., 996 F.2d 632, 637 (3d Cir. 1993).  The application of summary judgment in bankruptcy adversary proceedings in particular is an often efficient means to preserve limited estate assets.  It "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (*quoting* FED. RULE CIV. PROC. 1).

Under § 547(g), the trustee (and hence the plaintiff *sub judice)* bears the burden of proof by a preponderance of evidence for the five elements of an avoidable preference set forth in

32

§ 547(b).[26]  *See generally J.P. Fyfe, Inc. of Fla. v. Bradco Supply Corp.*, 891 F.2d 66, 71 (3d Cir.

1989). Section 547(g) places the burden of proof for § 547(c) defenses to preference on the

creditor.  Implicated for present purposes is the § 547(c)(2) ordinary course defense.

Statutory preference provisions were much narrower before the enactment of the 1978

Bankruptcy Code. *Union Bank v. Wolas,* 502 U.S. 151,159 (1991).  Under § 60 of the

Bankruptcy Act of 1898, a trustee was required to show that the payment was made at a time

when the creditor had "reasonable cause to believe that the debtor was insolvent." 5 COLLIER ON

BANKRUPTCY, 547.01 (Alan N. Resnick, et al. eds., 15th ed. rev. 2005) *citing Barash v. Public

Finance Corp.*, 658 F.2d 504, 510 (7th Cir. 1981).  With the enactment of the 1978 Bankruptcy

Code, Congress increased the trustee's ability to avoid preferences by eliminating this reasonable

cause to believe requirement; a presumption of insolvency within ninety days of bankruptcy was

also added.  *Union Bank,* 502 U.S. at 159.  The former requirement of "reasonable cause to

believe" deterred the "race of diligence" but "a creditor's state of mind has nothing whatsoever

to do with the policy of equality of distribution. . . ."  *Barash,* 658 F.2d at 510 *quoting* H.R. REP.

NO. 95-595, 1st Sess. 177-78 (1977).

The 1978 Code, in part balancing the general expansion of preference law, provided

among other defenses the § 547(c)(2) ordinary course defense; however, the defense was limited

to transfers made not later than forty-five days following the antecedent debt for which it was

---

[26]At issue here are:  § 547(b)(3) (insolvency at the time of transfer); (b)(4)(B) (insider
status of the bank at time of transfer); not at issue are transfer to or for a creditor's benefit,
transfer for an antecedent debt, and disproportionate distribution when measured in a Chapter 7
liquidation.

payment.   In 1984 Congress repealed the forty-five day provision (thus expanding the defense).

The forty-five day requirement had encouraged much "litigation regarding the fixing of the time"

that the debt was incurred. 5 COLLIER ON BANKRUPTCY, 547.04 (Alan N. Resnick, et al. eds.,

15th ed. rev. 2005).  Section 547(c)(2) was again amended in 2005 with the passage of the

Bankruptcy Abuse Prevention and Consumer Protection Act.  The ordinary course defense was

once again expanded by allowing a transferee to prove *either* that the payment of debt was

incurred according to ordinary business terms *or* in the ordinary course of business or financial

affairs of the debtor and transferee.  Before the 2005 amendment *both* standards had to be met.

     B.    <u>Insider Determination</u>.

An "insider," whose status as such would cause the extension of the preference look-back

period from ninety days (for noninsiders per § 547(c)(5)(A)(i)) to one year (for insiders per

subpart (c)(5)(A)(ii)), is defined in part by a nonexclusive list[27] of what has been termed

"statutory insiders."  Because this list is not intended to be exclusive, insider status for

nonstatutory types remains an issue for case-by-case determination.

A nonstatutory insider apparently is *not* "a person in *control* of the debtor" (emphasis

added), a listed *statutory* category.  *See* § 101(31)(B)(iii) as to an insider of a corporation.  Yet

control is not the defining concept for the largest set of *listed* insiders.  Indeed, the statutory

insider category can be quite broad without specifically implicating any "control" factor.  For

example, this listed category applies to both an affiliate of the debtor, and "an insider of an

---

[27]Section 101(31)(B), applicable to debtor-corporations, lists as insiders directors,
officers, control parties, relatives (§ 101(45)) of same, among others; *see also* § 101(31)(E),
deeming an affiliate (§ 101(2)), or insider of an affiliate "as if such affiliate were the debtor," to
be an insider.

affiliate as if such affiliate were the debtor." § 101(31)(E). An affiliate can be an entity which

holds as little as a twenty-percent block of a debtor's voting securities (per § 101(2)(A)), and *its*

*director* will be an insider *of the debtor*. *See* § 101(31)(E) in combination with §101(31)(B)(i).

Such an extension of the *statutory insider* scope focuses solely on *affinity*, apparently

establishing a nonrebuttable presumption of some degree of influence or consideration which

generates the expanded preference period and scrutiny.

Purported *nonstatutory* insiders are evaluated for preference purposes by examining: (i)

factual contexts centered on analogs to Code-listed types; or (ii) influence short of control

(would be "undue influence") or arm's lengthedness (or lack of it) in dealing with the debtor.

Such examinations propel the inquirer toward those well-worn but softly defined terms, "undue

influence" and "arm's length."  Is it the *potential* to so influence or deal at less than arm's length

that creates insider status, or the *actuality* of such a transaction?  Moreover, (as in this case), if

such an offending transaction has been found to have occurred *after* the transfer now targeted for

avoidance as a preference, does the subsequent event define insider status for the previous

transfer?  Often intertwined with the nonstatutory insider inquiry is the Code-described defense

to preference, the transfer made in the "ordinary course of business or financial affairs" as set

forth at length in § 547(c)(2).  Does a determination of nonstatutory insider status automatically

negate that defense, or is there yet another series of logical possibilities for conceptual

coexistence?

### *U.S. Medical and Winstar As Precedent*.

*In re U.S. Medical, Inc.*, 531 F.3d 1272 (10th Cir. 2008) reviewed a bankruptcy case in

which two years prepetition the debtor and creditor entered distribution and stock purchase

agreements.   The distribution agreement gave the debtor the exclusive distributorship for the

manufacturer-creditor in North America; required that the creditor be the sole manufacturer of

certain laser equipment for the debtor; and, allowed the creditor to appoint a member to the

debtor's board.  The stock purchase agreement permitted the creditor to purchase a 10.6% equity

interest in the debtor.  The two agreements formed the basis for a *strategic alliance* between the

debtor and creditor pursuant to which the creditor's CEO, Seitz, was appointed to the debtor's

board.  Seitz attended every board meeting and had access to all debtor's financial information,

but did not vote on matters pertaining to payment to his company, the creditor.

After the debtor filed a voluntary petition under Chapter 7, the trustee filed an adversary

proceeding against the creditor to avoid payments made to the creditor between ninety days and

one year before the petition date.  It was claimed that the creditor was an insider of the debtor.

The bankruptcy court ruled that the creditor was a nonstatutory insider of the debtor because of

the "'extreme closeness'" between the parties.  *Id.* at 1274.  This result was reached "even

though [the bankruptcy court] specifically found *no evidence* that Seitz, as Creditor's

representative, controlled, sought to control or exercised any undue influence on Debtor."  *Ibid.*

(emphasis in original).  The Court of Appeals, noting that Seitz was "sensitive to 'potential

conflicts of interest,'" found that the parties "'attended to the kinds of formalities one would

expect to see in dealings between third parties at arm's length.'" *Ibid.*  The creditor's ten percent

share of the debtor did not "allow[ ] Creditor to control or attempt to exercise any undue

influence on the Debtor."  *Ibid.*  The Bankruptcy Appellate Panel had reversed the trial court,

*quoting In re Friedman*, 126 B.R. 63, 70 (B.A.P. 9th Cir. 1991) for the proposition that "not

every creditor-debtor relationship attended by a degree of personal interaction between the

36

parties rises to the level of an insider relationship." "[C]loseness alone does not give rise to

insider status." *See In re U.S. Medical*, 531 F.3d at 1275, *quoting* the B.A.P. below.

In honing the test for nonstatutory insider status, the Tenth Circuit provided the following

authoritative pronouncements:

> "In ascertaining insider status, then, courts have looked to the closeness of the relationship between the parties and to whether any transactions between them were conducted at arm's length."

531 F.3d at 1277, *quoting In re Krehl*, 86 F.3d 737, 742 (7th Cir. 1996).

> An arm's length transaction is "[a] transaction in good faith in the ordinary course of business by parties with independent interests. . . .  The standard under which unrelated parties, each acting in his or her own best interest, would carry out a particular transaction."

531 F.3d at 1277, n.4, *citing* BLACK'S LAW DICTIONARY, 109 (6th ed. 1990).

> "The consideration of insider status focuses on two factors: (1) the closeness of the relationship between the parties; and (2) whether the transaction was negotiated at arm's length."

531 F.3d at 1277, *citing* 5 COLLIER ON BANKRUPTCY, ¶ 547.03[6] (Alan N. Resnick et al. eds., 15th ed. rev. 2008) [sic 2005].

> The "control" to which such cases refer can only correctly be interpreted as something short of actual, legal control over the debtor's business because "actual control" would subject the creditor to the statutory category of  "person in control of the debtor"  under  11  U.S.C.  §  101(31).    Any interpretation of "control" within the non-statutory-insider context as anything like the ability "to order, organize or direct" the debtor's operations is simply incorrect.  *Friedman*, 126 B.R. at 71.

531 F.3d at 1277, n.5.

37

The Court reiterated the derivation of "non-statutory insider" from its prior decision in *In re Kunz*, 489 F.3d at 1078-79, which emphasized that the word "includes" in the statutory definition of insider, 11 U.S.C. § 101(31), means that the statutory categories are illustrative. However, where *Kunz* seemed to qualify one as a nonstatutory insider based solely upon "a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of dealings between the parties," *ibid., U.S. Medical* was clearly to the contrary. Quoting from *In re Friedman*, 126 B.R. at 69-70, the Tenth Circuit in *In re U.S. Medical* reprised:

> The case law that has developed [ ] indicates that not every creditor-debtor relationship attended by a degree of personal interaction between the parties rises to the level of an insider relationship. A common basis for these rulings was the perception that, while a creditor may be in a strong bargaining position in dealing with the debtor, so long as the parties transact their business at arm's length, such circumstances do not necessarily give rise to insider status even though there was some degree of personal relationship with the debtor. It is unlikely that Congress intended that complex business relationships existing over a period of time, attended by some personal involvement but without control by the creditor over the debtor's business, would subject such creditor to insider status.

531 F.3d at 1277-78.

The Court concluded, "for a bankruptcy court to hold that a creditor is a non-statutory insider in circumstances like these, a trustee must prove that the creditor and debtor did not operate at arm's length at the time of the challenged transaction." *Id.* at 1280.[28]

---

[28]The Tenth Circuit was not moved by the label "strategic alliance" to find insider status and notably distinguished *In re Winstar Commc'n, Inc.*, 2003 WL 21356090, *9 (Bankr. D. Del. May 29, 2003) where it appeared that the defendant investor and global systems designer had greater "involvement" with the debtor.  531 F.3d at 1282.  Rather, the court impliedly commended the B.A.P. below for declining to establish a "per se" or "de facto" nonstatutory insider rule that any corporation which seated a director on the board of a second corporation

*In re Winstar Commc'n, Inc.,* 554 F.3d 382, 388 (3d Cir. 2009) addressed the

nonstatutory insidership issue in a different business context than that of *U.S. Medical.*   The

debtor (ultimately in a Chapter 7 case) and the target creditor, Lucent Technologies, Inc.

("Lucent"), initially had a commercial relationship in which Lucent sold goods to the debtor.  In

October 1998 the debtor and Lucent entered a "strategic partnership" (so named by the parties)

by which Lucent agreed to finance and to build the debtor's global broadband

telecommunications network.  *Id.* at 391-92.  Between October 1998 and May 2000 the parties

entered a sequence of agreements (two finance agreements and a supply agreement).  *Ibid.*

Through a "First Credit Agreement" and "Supply Agreement" Lucent extended the debtor a $2

billion line of credit secured by a lien on all debtor's assets, and debtor agreed to purchase

65-70% of equipment and services for the network from Lucent or face escalating surcharges.

(Debtor's subsidiary was a contract party with Lucent to serve as subcontractor to provide

competencies which Lucent lacked.)  In May 2000 the debtor obtained additional financing by

way of a bank facility (secured by the debtor's assets) and raised equity which it used in part to

pay off $1.2 billion of the Lucent loan, and Lucent released its lien.  Simultaneously the debtor

entered a "Second Credit Agreement" with Lucent for a $2 billion line of credit with immediate

access to $1 billion.  The Second Credit Agreement was not secured by a lien on the debtor's

assets, but provided substantial financial restrictions including *a requirement that the debtor use

any increase in the bank facility to pay Lucent.  Id.* at 392.

---

became a nonstatutory insider of the second corporation. *Ibid.* "Such a rule would force
corporations to find directors from companies with which they do no business and would
impermissibly create a new category of insider not determined within the context of 'particular
cases, based on the specific facts.'" *Ibid.*

In November 2000 Siemens, a Lucent competitor, joined the bank facility as a lender to the debtor and the bank facility was in fact increased. *Id.* at 393. The debtor asked Lucent to waive part of the repayment requirement of its agreement, seeking permission to keep half the Siemens loan; Lucent refused, issuing a "consent letter" which contained additional demands. *Id.* at 394. When the debtor did not acquiesce, Lucent suspended negotiations and threatened to close off advances on its line of credit. *Ibid.* The debtor acceded to Lucent's demands and on December 7, 2000 paid Lucent $188,180 (the Siemens net loan proceeds minus credits). In bankruptcy, the Chapter 7 trustee sought to avoid the $188,180 payment to Lucent as preferential (and to subordinate Lucent's claims against the estate).

Because the debtor's payment to Lucent fell outside the ninety-day period it was necessary for the trustee to contend that Lucent was an insider under 11 U.S.C. § 547(b)(4)(B).

The Third Circuit in *Winstar* followed the example of *U.S. Medical*, agreeing with the Tenth Circuit that "actual control" defines an insider under 11 U.S.C. § 101(31)(B)(iii), but actual control is not a component of nonstatutory insidership. *In re Winstar*, 554 F.3d at 396. The Court thus limited the "control" requirement to its statutory place. In its holding the Third Circuit quoted *U.S. Medical*:

> [W]e hold that it is not necessary that a non-statutory insider have actual control; rather, the question "is whether there is a close relationship [between debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length.

*Id.* at 396-97.

40

Citing a series of overbearing acts,[29] the Court deemed Lucent to be a nonstatutory

insider.  In rejecting Lucent's argument that it was merely driving a hard bargain and that each

party had the ability to obtain concessions from the other, the Third Circuit concluded:

> These findings may suggest that Lucent did not exercise actual
> control over Winstar. . . .  However, the Bankruptcy Court's findings
> demonstrate that Lucent had come to dominate the parties'
> relationship by December 7, 2000 (the date on which the alleged
> preferential transfer occurred).  Therefore, we cannot conclude that
> the Bankruptcy Court's finding that the parties did not deal at arm's
> length was clearly erroneous and we hold that Lucent was a non-
> statutory insider of Winstar.

*Id.* at 399-400.

### *Essence of Plaintiff's Argument*.

The plaintiff's ultimate argument *sub judice* in derogation of the October repayment of

$1 million is that the money had a "better use" or others should have had "priority."  This

culminating point, delivered with the benefit of hindsight, focuses on the open trade accounts as

nonspecifically referenced by acting CFO Mohrle.  As the argument goes, it is assumed that the

basis for the repayment was Brockman's interest in favoring a friendly creditor with which he

had an affiliation, and that the characteristics of the October transfer were akin to those of the

December mortgage transfer.

The plaintiff's argument does not account for substantial differences in the two transfers,

and the change of circumstances of BMC between the October loan pay down and the December

---

[29]These acts included: coercing the debtor to buy goods which the debtor did not need or
which never left the Lucent warehouse, the "sales" often timed to enhance Lucent's financial
reports; treating the debtor as a captive purchaser; and, compelling the debtor to make purchases
which violated the capital expenditures covenant in the Lucent Second Credit Agreement and
then refusing to issue the waiver which would have given the debtor relief.  *Id.* at 397-98.

mortgage transfers.  It also treats "equal distribution" as immutable while ignoring clear, commonsense and commercially necessary limitations on the reach of preference-based transfer avoidance.

The December mortgage transfer, found to be at other than arm's length, had the following attributes/context which took it out of the ordinary course of business or financing (whether measured "subjectively" or "objectively"):

(i)    It took place after default on the basic loan and after the bank issued notice of default;

(ii)    The transfer was authorized at and made after the watershed board of trustees meeting of December 7, 2006, at which the BMC board was advised of the hospital's desperate financial condition, the unavailability of the hoped for HCFFA bond funding, and the substantial prospect of bankruptcy (specifics which were not widely disseminated to other creditors at that time);

(iii)    The real estate mortgage provided as collateral–i.e., that which was transferred to Pamrapo–recast the unsecured credit line which had persisted since February 2005 into a secured loan (one which was thus distinctively different from the preexisting documented transaction *and* inconsistent with the nature of both the original loan and the loan extension of May 2006);

42

(iv)     There was no "end game" for the loan as revised (its June 1, 2007 maturity
simply being eyewash, without any real anticipation of payment from
hospital funds);

(v)      Pamrapo was pressing very hard for the collateral, and was influencing the
decision to give collateral through intense efforts of Campbell, Brockman
and other BMC trustees who had affiliations with Pamrapo;

(vi)     The collateral provided by the December mortgage was intended to secure
the *entire balance* of the bank loan, not a portion of it;

(vii)    The real estate identified in the mortgage transfers was essentially the last
"freed-up" asset of the debtor; and

(viii)   The ninety-day noninsider preference period was seemingly a factor in the
rushed (and somewhat botched) mortgage drafting and recording.

The October transfer had the following contrasting characteristics and context:

(i)      By repaying $1 million[30] of the $3 million outstanding, only the prior May
credit line increase was reversed dollar-for-dollar (whereas the mortgage
was intended to provide protection for the bank's entire exposure);

(ii)     There was no default at the time of the partial repayment;

(iii)    Notwithstanding being under financial pressure, the hospital's financial
statements showed it to be "solvent,"[31] $10 million had just been infused

---

[30]As set forth more fully in Parts V(C) and (D), *infra*, though the $1 million payment was
not insignificant, it did not exhaust BMC's cash nor was the amount overwhelming given the
magnitude of the hospital's business.

[31]*See* Part V(D), *infra*.

43

on the sale of bond anticipation notes, and the $80 million bond issue

application was still seen as viable and the object of both Nuveen and

bank reliance;

(iv)     Though the credit line maturity date was a month away, prepayment

(including partial prepayment) was expressly permitted by the loan

documents, was not out of step with the earlier credit line adjustment well

in advance of loan maturity,[32] *and* there was a clear extra-document

understanding linking receipt of bond proceeds to loan repayment;[33]

(v)     The receipt of Nuveen funds in anticipation of HCFFA bonding was an

ordinary step along the way toward ultimate bond issuance,[34] these funds

were made available during a period of delay in the bond processing, and

they served as a business-sensible source of partial repayment to the bank

(such partial repayment not inconsistent with the hospital-bank

understanding of the short-term nature of the 2005 credit transaction as

recast and increased by the stop-gap $1 million in May 2006[35]);

---

[32]The credit line was restructured per the May 12, 2006 loan documents some forty-nine days before its July 1, 2006 maturity date.

[33]The BMC letters to Pamrapo of May 5 and 9, 2006 are explicit in this regard, as is the bank's Underwriting Memorandum of May 11, 2006.  *See* Russo Certif., Ex. 2 and notes 15 and 19, *supra.*

[34]*See, generally,* N.J.S.A. 26:2I-7(a); *cf.* N.J.S.A. 40A:2-8.1 and 40A:5A-24; Warren Ruppel, *Governmental Accounting Made Easy* 47, 64 (John Wiley & Sons, Inc.) (2005).

[35]On a cash flow basis, if $3 million were to have been repaid from the net cash of HCFFA bond proceeds, i.e., $80 million less payoff of existing bonds of at least $42-$43 million and the $10 million Nuveen notes, a greater *proportion* of that net would have been attributable to such a repayment (i.e., $3 million of the net of not more than $28 million), than the $1 million

44

(vi)     Bankruptcy was not in the hospital-bank lexicon in October 2006;

(vii)    As it turned out, October was a huge "loss" month for BMC–a loss which
         was obviously not realized and booked at the time of the repayment;

(viii)   There is no evidence of creditor hounding for repayment of the hospital by
         the bank, but rather a more tacit understanding of the use of bond-like
         proceeds;

(ix)     There was no overt statement in October, as there was Brockman's in
         December, to "remember the generosity of the bank"; indeed, there is no
         indication in the record that Campbell believed at that time that influential
         intervention was necessary;[36] and

(x)      There is no indication that the repayment was maneuvered to "beat the
         clock"–i.e., to accelerate the transfer to take it outside of the perceived
         ninety-day preference period (and, in fact, the transfer was fully 180 days
         before the filing).

Reading the facts most favorably to the plaintiff in considering the bank's summary
judgment motion, the plaintiff would have this court consider that Mohrle in fact cautioned
Brockman against using the $1 million before maturity of the bank loan (wanting to use the
money for unspecified trade creditors, etc.), and that Brockman, as a person with ties to the bank,
prompted (as Mohrle states it) the issuance of the check to Pamrapo.  With such a fact base, the
plaintiff argues that Brockman and Campbell should have absented themselves (as Seitz did in

---

partial pay down bore to the $10 million Nuveen bond anticipation funds.

[36]*See* Campbell Tr. 96:9-99:21.

*U.S. Medical*) from the decision to so use part of the Nuveen proceeds, and that the entire BMC

board of trustees should have met to set priorities on their use.[37]   Certainly the common

directors/trustees could have been more careful in their approach to joint BMC-Pamrapo

business.  To the extent that there is evidence of nonrecusal from discussions of, or voting on

such matters, bad habits developed which came home to roost in the December BMC board

meeting which approved the mortgage transaction.  But the 2005 and May 2006 origins of the

credit line–with its bridging increase and reliance on the bond application process–provide an

ample basis for the exercise of business judgment contrary to Mohrle's very general cautionary

comments to Brockman. One cannot fairly ignore both the background and nature of the October

transfer.  Nor should this court completely discount the disarray of the BMC management in

October of 2006.  Evans, the CEO, had resigned and was there (if at all) as a lame duck; Aaron,

the CFO, had just left; the board of trustees, public-spirited part-timers serving as volunteers,

was hardly in a position to make day-to-day management decisions.  Such matters appear to have

fallen to some extent to Brockman, as the longtime board Chairman.

---

[37]Along the way, the plaintiff contests the arm's lengthedness of the October transfer by
pressing the point that it was not in the ordinary course because: the loan which was in part
repaid was "unique," and thus extraordinary, given that it was overly gracious and charitable in
its treatment of the community hospital (both in terms of the formalisms of the application
process and loan substance); that other potential borrowers were not provided with such grace (a
purported FIRREA violation); that votes of both boards approving the May 2006 loan extension
seem to have included those cast by Campbell and Brockman (in purported violation of hospital
conflict-of-interest bylaws, policies and procedures and bank conflict-in-lending policy); that the
repayment itself violated BMC bylaw conflict provisions; and, that Nuveen funds were said to be
misused (per the plaintiff's reading of the August resolution of the BMC trustees and purported
preexisting bond indenture restrictions) when $1 million of the loan proceeds was directed to the
bank.  Even viewing the factual underpinnings of these assertions in a light most favorable to the
plaintiff for summary judgment purposes, they do not destroy arm's lengthedness in the October
transfer.  To the extent not specifically dealt with in this Part, these arguments are addressed in
Part V (C), *infra*.

46

Viewing the entirety of the circumstances (mostly uncontested but where at issue, most favorably to the plaintiff), the fact that Brockman did not convene a meeting of "neutrals," does not convert what this court finds to be an *unexceptional* repayment of a short-term loan into an extraordinary event.  In context, the repayment of a vitally important bridge loan–i.e., the May 2006 credit line *increase* of $1 million (and not the entire loan balance of $3 million)–at a time when $10 million of bond anticipation funding was received, was "'[a] transaction in good faith in the ordinary course of business by parties with independent interests.'"  It satisfied "'[t]he standard under which unrelated parties, each acting in his or her own best interest, would carry out a particular transaction.'"  In re *U.S. Medical,* 531 F.3d at 1277 n.4, *quoting* BLACK'S LAW DICTIONARY, 109 (6th ed. 1990), quoted with approval in *Winstar,* 554 F.3d at 399.

In barest form, BMC acted consistently with the tenor of the deal it had made with the bank; it repaid the *increase* (only) in the credit line out of funds which became a hoped-for forerunner to the delayed bond issue; and, it acted in its own interest by so satisfying its obligations.  The bank neither controlled the hospital, nor dominated the parties' relationship at the time of the transfer.  *Compare and contrast Winstar*, 554 F.3d at 399-400.  The questioned payment might not have been the best business deal for BMC nor the best deal for creditors (viewed with history's benefit).  However, if neither Brockman nor Campbell had had anything to do with this payment, it would pass the smell test as satisfying a short-term obligation incurred as a stop-gap.  Assuming they prompted the payment, *the texture of the transaction is unchanged:* it is one "at arm's length." Brockman's and Campbell's involvement, contributing to a conclusion that there was a clear hospital-bank affinity, required scrutiny of the $1 million repayment.  That scrutiny by this court has resulted in a conclusion that there was arm's length

47

dealing in the October transfer, as well as in the transaction giving rise to that repayment.

*Consider Union Bank v. Wolas*, 502 U.S. 151 (1991).[38]

### *"Any" Transaction Not at Arm's Length Defining Status for the "Challenged" Transaction?*

The finding of "at arm's length" for the challenged October transfer does not end the

nonstatutory insider inquiry in this case, involving first an arm's length transaction and then one

not at arm's length.[39]  Perhaps at the threshold of inquiry is whether mere *potential* for dealing at

---

[38]Implicit in the plaintiff's argument is that bank debt should be differentiated from other trade debt and hospital obligations; though couched in terms of "short-term" and "long-term" debt (bank debt in *Union Bank* being the latter, a different status from the Pamrapo debt as a current liability), the Supreme Court spelled out the following policy considerations in *Union Bank* which run *contra* to the plaintiff's implication:

> But the statutory text–which makes no distinction between short-term debt and long-term debt–precludes an analysis that divorces the policy of favoring equal distribution from the policy of discouraging creditors from racing to the courthouse to dismember the debtor. Long-term creditors, as well as trade creditors, may seek a head start in that race. Thus, even if we accept the Court of Appeals' conclusion that the availability of the ordinary business exception to long-term creditors does not directly further the policy of equal treatment, we must recognize that it does further the policy of deterring the race to the courthouse and, as the House Report recognized, may indirectly further the goal of equal distribution as well. Whether Congress has wisely balanced the sometimes conflicting policies underlying § 547 is not a question that we are authorized to decide.

502 U.S. at 533.

[39]The legislative history of the "insider" term simply assumes non-arm's length dealing of such a party, as follows:

> [A]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny *than those dealing at arms [sic] length with the debtor*. [Emphasis added.]

S. Rep. No. 95-989 at 25 (1978), 1978 U.S. Code Cong. & Admin. News 5787, 5810; H.R. Rep.

other than arm's length–without more–is sufficient to support the determination of insider status.

Indeed, Pamrapo has been found to be a nonstatutory insider in the December mortgage transfer,

that being proof positive of its potential for non-arm's length dealing.  Does that potential, or the

actualizing of undue influence and the development of a nonordinary course December

transaction (obviously post-dating the challenged October repayment), define Pamrapo as an

"insider" in the October ordinary course/arm's length transaction?

   *U.S. Medical* at first describes the necessary inquiry as "whether there is a close

relationship *and* whether there is anything other than closeness to suggest that any transactions

were not conducted at arm's length."  531 F.3d at 1277 (emphasis in original), quoted in

*Winstar*, 554 F.3d at 397.  It seems as though "any transactions" (or "some transaction," 531

F.3d at 1280) at other than arm's length is required to qualify the transferee as a nonstatutory

insider.  Yet, the *U.S. Medical* opinion goes on to direct bankruptcy courts as follows:

> Therefore, for a bankruptcy court to hold that a creditor is a
> non-statutory insider in circumstances like these, a trustee must prove
> that the creditor and debtor did not operate at arm's length *at the time
> of the challenged transaction.*

531 F.3d at 1280 (emphasis supplied).  Certainly the finding of a non-arm's length transaction is

at least a factor in determining whether a creditor receiving yet *another* challenged transfer from

the debtor holds the nonstatutory insider status as to the challenged transaction and/or throughout

the entire period of the subject relationship.  However, the sequencing and circumstances of the

tainted transfer relative to the challenged transaction should likewise be considered as *factors* in

evaluating insider status.  There should be no hard and fast "*per se*" rule requiring that  "any

---

No. 95-595 at 312 (1977).  Both *U.S. Medical* (531 F.3d at 1279-80) and *Winstar* (554 F.3d at
397) quote this language.

transaction[]" not at arm's length (along with affinity), renders the creditor an insider for the challenged transaction.  To the extent that *U.S. Medical* references "any transaction" not at arm's length, and *Winstar* recites that reference, the deciding courts have not been called upon to consider a *per se* rule and to review a multiple transfer case.

It is noteworthy that both *U.S. Medical* (531 F.3d at 1277) and *Winstar* (554 F.3d at 396) cite with approval and quote 5 COLLIER ON BANKRUPTCY, ¶ 547.03[6]  (Alan N. Resnick, et al. eds., 15th ed. rev. 2008) [sic. 2005] (the affinity prong "and (2) whether *the transaction* was negotiated at arm's length" [emphasis added]).  That treatise section plainly expresses the view that insider status is to be determined "at the time of the transfer" (*id*. at p. 547-41), reciting as support (*id*. at n.82) the following:

> The point in time when the transferee was an insider is critical.  "The language of section 547(b)(4)(B) clearly states that an insider relationship is to be determined on the *exact date* of the challenged transfer."  Dent v. Martin, 86 B.R. 290, 292 (S.D. Fla. 1988) (quoting McWilliams v. Gordon (In re Camp Rockhill, Inc.), 4 C.B.C.2d 1059, 1064, 12 B.R. 829, 834 (Bankr. E.D. Pa. 1981) (emphasis in original)); *see also* Butler v. David Shaw, Inc., 72 F.3d 437 (4th Cir. 1996) (transfer made within one year insider reachback period was not preferential because recipient, who was an affiliate of the debtor, executed a stock-relinquishment agreement which immediately terminated its insider status just prior to its receipt of a check that was not honored by the bank until the next day; thus, on the date of the transfer (when the check was honored the recipient was no longer an insider).

Most significantly, § 547(b)(4)(B) conditions the extension of the preference period to one year "if [the transferee] creditor *at the time of the transfer* was an insider."  (Emphasis added.)

50

Considering (i) the impact on commerce of a one-year avoidance period,[40] (ii) the commonly accepted linking of directorships along a broad spectrum of business life, and (iii) the specifics *sub judice* involving public service on a nonprofit hospital board as a local bank's view of its community duty (a duty which drew it into a loan transaction which was advantageous to the hospital), this court will reject *in the current circumstances* the concept that "any transaction" not at arm's length *per se* defines the transferee's status at the time of a transfer in the ordinary course.  More specifically, upon this court's review of the undisputed facts and disputed facts viewed most favorably to the plaintiff, no evidence establishes that through October 2006 the affinity aspects of the BMC-Pamrapo relationship made these institutions anything but important cooperating members of the same Bayonne community.  Pamrapo, as the local bank, stood ready to support and did support the local community hospital.  The position of Campbell on the hospital board–and Brockman on that of Pamrapo–was to the mutual advantage of both institutions (as were the other connections).  One should be mindful not to impair service on boards, particularly service for the benefit of a nonprofit community hospital.  Some degree of participation by officers and directors of financial enterprises on boards of entities with whom their principals do business is an important feature of our commerce.  The Code stops short of extending statutory insider status to the entities whose officers and directors sit on boards of

---

[40]Among the conceptual concerns with extending the reach of preference avoidance is the basic point that preferences are neither fraudulent nor constructively so.  *Distinguish* 11 U.S.C.§ 548.  *Value* was provided by the would-be preferred creditor.  Here, that value was a virtually charitable lifeline to a struggling community hospital. Moreover, while *statutory* insiders are at risk of transfer avoidance for a year preceding bankruptcy, the Code gives them more or less specific *notice* of their jeopardy.  *Nonstatutory insiders* are likewise at risk, but their status is determined with the benefit of hindsight.  And bear in mind that *control* is, by virtue of the text of the statutory list of insiders, excluded as an aspect of this category of insidership.

what become bankruptcy debtor corporations. Such a statutory extension would, in this court's view, have a strong negative impact on corporate governance and business relationships. Extensions of insider status based upon linked directorships should be approached with a substantial degree of caution. *U.S. Medical* is a clear example of such restraint where the debtor had on its board an officer of a strategic business partner (that entity, in fact, owning ten percent of the debtor's stock).[41] As applied to business community participation in the governance of nonprofit institutions, caution should be heightened before preference law is extended through the avenue of the "non-statutory insider."

Such a determination answers, for this court, the inquiry as to whether the mere *potential* to deal at other than arm's length is enough (along with affinity) to qualify a party for nonstatutory insider status. It does not.[42] Therefore, for all of the reasons set forth in this part,

---

[41]In addressing a concern of the BAP that "a closeness-alone test would create a 'de facto director,' per se rule," the Tenth Circuit admonished in rejection of the per se test that "[s]uch a rule would force corporations to find directors from companies with which they do no business." 531 F.3d at 1282.

[42]In *Gilchinsky v. Nat'l Westminster Bank N.J.,* 159 N.J. 463 (1999), the Supreme Court of New Jersey found that, though not a statutory insider as defined in N.J.S.A. 25:2-22(a), a transferring debtor who essentially conveyed assets *to herself*, was *herself* a nonstatutory insider within the meaning of N.J.S.A. 25:2-26(a). The Uniform Fraudulent Transfer Act is consistent in relevant text with the Bankruptcy Code. In discussing *statutory insiders*, the Supreme Court noted that the "unifying theme among the enumerated persons is that they stand in such close relation to the debtor as to give rise to the inference that they have the ability to influence or control the debtor's actions." 159 N.J. at 478. This court does not agree with the plaintiff *sub judice* that there should be an extrapolation of this text which would have state law define nonstatutory insiders by their *potential* to influence or control, other than perhaps to establish *affinity* (as a first prong of a two-prong test–the second aspect being transfer at other than arm's length). It is worth noting that *Gilchinsky* is an *actual fraud* case per N.J.S.A. 25:2-25 (thus implicating "badges of fraud," including transfer to an insider). UFTA, as it would apply to insider preferences at § 25:2-27(b), requires for avoidance (as the Code no longer does) that the transferee insider "had reasonable cause to believe that the debtor was insolvent" at the time of the transfer; this court finds no evidence of such a belief or reason to so believe on the part of

52

this court finds that Pamrapo was not an "insider" for § 547(b) and N.J.S.A. 25:2-27(b) purposes

when it received the $1 million payment in October 2006. Summary judgment should be granted

to the bank on Counts I and IV of the Amended Complaint.

    *Impact on Policy of Equality of Distribution*.

    Of course, by allowing this repayment to go unavoided, other general unsecured creditors

of BMC would be denied participation in the $1 million transfer. But the "equal distribution"

purpose of the preference law is often limited. For example, consider the basic ninety-day cutoff

for most preference avoidance. The equality of distribution concept also "partners" in policy

with the imperative to deter the "race of diligence" to the courthouse. That purpose at times

serves as a counter balance to the distribution purpose, or it "may indirectly further the good of

equal distribution." *Union Bank*, 502 U.S. at 533. Perhaps the best lenses through which to

view preference policy are the exceptions to preference by way of carved out defenses; and, it is

the "ordinary course" defense of § 547(c)(2), which is most relevant *sub judice*.[43]

    This court will review the ordinary course defense for the following reasons: first, as

pointed out above, that defense in limitation of equality of distribution helps expose boundaries;

second, the arm's length transaction prong of nonstatutory insider analyses is often couched in

"ordinary course" terms (and comparison of that ordinary course term and § 547(c)(2) is a

worthy study); third, and most important to this court's mission, if this court is mistaken in its

---

Pamrapo. *See* Part V(D), *infra,* and consider the positive effect on the bank's view of BMC's
solvency occasioned by the Nuveen infusion of $10 million.

    [43]With the 2005 Code amendments, particularly at § 547(c)(2), "the normative
underpinnings of preference law are again weakened. The lame legs that principles of equality
and deterrence had to run on were crippled even further." Charles J. Tabb, *The Brave New
World of Bankruptcy Preferences*, 13 AM. BANKR. INST. L. REV. 425, 455 (Winter 2005).

view that Pamrapo is not a nonstatutory insider (most particularly based on the mortgage transfer

as supposedly tainting the bank's status for all purposes), then the defense must be fully

considered here.

    C.      <u>"Ordinary Course" Defense</u>.

    An arm's length transaction (the conclusion sought for transfers to those transferees

resisting nonstatutory insider status) is commonly described as being "in the ordinary course of

business by parties with independent interests." *U.S. Medical*, 531 F.3d at 1277 n.4.  The

imbedded ordinary course term is legal vernacular, though not having the contextual structure of

the Code "ordinary course" defense of § 547(c)(2).[44]  *Compare and contrast* the New Jersey

version of UFTA, which articulates the defense in much less structured terms.[45]

    As pointed out earlier, the burden of proving nonstatutory insider status (including

*non-arm's length* transfer) falls to the plaintiff in preference cases; to the contrary, § 547(c)(2),

---

[44]      (c) The trustee may not avoid under this section [§ 547] a transfer

      –

      (2)    to the extent that such transfer was in payment of a debt
              incurred by the debtor in the ordinary course of business or
              financial affairs of the debtor and the transferee, and such
              transfer was--
      (A)    made in the ordinary course of business or financial
      affairs of the debtor and the transferee; or
      (B)    made according to ordinary business terms;

§ 547(c)(2).

[45] A transfer is not voidable under subsection b. of R.S. 25:2-27:

      (2)    If made in the ordinary course of business or financial
              affairs of the debtor and the insider. . . .

N.J.S.A. 25:2-30(f).

as a defense, becomes the proof burden of the transferee in such cases.  This difference in

burden, as well as the relative intricacy of the § 547(c)(2) defense as compared to the simple

vernacular standard for the insider analysis, distinguishes these two areas of inquiry.  Of course,

there will be evidentiary overlap.

The ordinary course defense remains generally available to both statutory and

nonstatutory insiders.  *U.S. Medical* provided as follows:

> [A] non-statutory insider who has engaged in a  less-than-arm's-
> length transaction fits just as well into the Bankruptcy Code
> provisions as a per se insider. We hold here that a creditor may only
> be a non-statutory insider of a debtor when the creditor's transaction
> of business with the debtor is not at arm's length; a bankruptcy court,
> however, may find a statutory insider without this requirement. The
> "ordinary course of business" defense is still available for any
> transactions between a non-statutory insider and a debtor as well as
> for transactions between a statutory insider and a debtor that are in
> "the ordinary course of business"– transactions that must be at arm's
> length. 11 U.S.C. § 547(c)(2)(A).

531 F. 3d at 1280.[46]

The Third Circuit has identified the competing goals of preference avoidance and the

ordinary course defense which would render an otherwise avoidable transfer nonavoidable, as

follows:

> On the one hand the preference rule aims to ensure that creditors are
> treated equitably, both by deterring the failing debtor from treating
> preferentially its most obstreperous or demanding creditors in an
> effort to stave off a hard ride into bankruptcy, and by discouraging
> the creditors from racing to dismember the debtor. On the other hand,

---

[46]In the immediate next paragraph, the Tenth Circuit first pressed the point that "a
nonstatutory insider, by definition, is not operating at arm's length with the debtor," but then
offered that at least in the circumstances "like these" there would be no finding of nonstatutory
insider status unless it was established that the debtor and creditor "did not operate at arm's
length *at the time of the challenged transaction.*"  (Emphasis added.)

> the ordinary course exception to the preference rule is formulated to
> induce creditors to continue dealing with a distressed debtor so as to
> kindle its chances of survival without a costly detour through, or a
> humbling ending in, the sticky web of bankruptcy.

*In re Molded Acoustical Products, Inc*., 18 F.3d 217, 219 (3d Cir. 1994).

Ordinary course analysis is factual.  *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991).  For purposes of § 547(c)(2), the analysis is divided into three elements.  The preamble element tests the debt underlying the transfer for ordinariness; assuming such a finding, then either the (c)(2)(A) so-called subjective element of ordinariness of the transfer in the dealing of the parties, *or* the objective element of ordinariness of the business terms of the subject transfer per (c)(2)(B), must be found to support this defense to preference.

### *Debt Incurred in the Ordinary Course*

The preamble requirement of § 547(c)(2) focuses on the *debt* for which the challenged transfer was payment.  In this case, the inquiry is whether the credit line loan was provided by the bank in the ordinary course of its business, and so undertaken by the hospital.  At the most general level, the loan transaction (both in 2005 and 2006) was an unexceptional part of the business of banking, and the borrowing by the hospital to maintain cash flow through the bank line was likewise not atypical for this or any other medical center.  The transaction was quite regular and expected commerce for both entities.  And, given the regularity of this banking transaction viewed most broadly and generally, the preamble prong of the (c)(2) defense would, on its face, be satisfied.

The plaintiff, however, presses the particulars, claiming: the loan was "unique," made at a favorable interest rate and on other relaxed terms not available to other borrowers, made with next to no business or financial analysis, and seemingly voted upon (to one or another extent) by

56

bank directors and BMC trustees who should have, per various conflict rules and bylaws, recused themselves.

These contentions, even if borne out at trial, simply portray a transaction in two parts (February 2005 and May 2006), which was most advantageous and beneficial to the debtor, and easily obtained. But the plaintiff, characterizing such a portrayal most negatively, would have this court turn preference law on its conceptual ear and *damn the lender for preferring the debtor*. If that were the accepted convention, the message to creditors would be: don't treat debtors with bankruptcy potential too well; you'll forfeit ordinary course status for your easy terms. A substantial policy underpinning of § 547(c)(2) is precisely the opposite of such a message.

Similarly, the plaintiff claims that the loan transactions favoring the nonprofit community hospital "were in violation of Federal banking regulations," *citing* 12 C.F.R. §§ 215.2 and 215.4. *See* Dkt. 31 at 38-40. This contention builds to the conclusion that federal regulation, under the circumstances of this case, negate community based bank lending favoring a local nonprofit hospital if such favorable terms are not made available for comparable transactions (presumably those establishing lines of credit) to other bank customers. In essence, the contention is that exclusively favorable loans were given to BMC, an alleged "insider" of the bank, all contrary to 12 C.F.R. § 215.4. Such a reading of national banking policy is simply incorrect.[47]

---

[47]Structurally, the plaintiff would piece together selected C.F.R. segments, first properly identifying Brockman and Campbell to be bank "insiders" per 12 C.F.R. § 2(h) as directors (and, in Campbell's case as an officer as well). However, the argument then seeks to parlay the definition *to include BMC* as an "insider" by claiming that the community hospital is a "related interest" of the insiders, Brockman and Campbell. "Related interest" of a person includes "[a] company that is *controlled* by that person." 12 C.F.R. § 215.2(n) (emphasis added). "Control" of a company per 12 C.F.R. § 215.2(c)(1)(iii) "means that a person directly or indirectly, or

Pamrapo, in 2005, was only beginning to reenter the unsecured commercial lending

market after a thirty-year hiatus.[48]  The BMC loan was its earliest and largest such loan.

Documentation was ill-suited to the loan; the application process was informal (if not sloppy);

sensible recusal was not adhered to in voting.  Yet, notwithstanding the foregoing, the nature of

the loan transaction is overriding.  The local community bank had made a deferential loan to the

local community hospital.  Easy terms and processing are to be hoped for in such circumstances,

not viewed after-the-fact as "improper."  Errant voting, though not justified, was immaterial to

---

acting through or in concert with one or more persons  . . . [h]as the power to exercise controlling
influence over the management or policies of the company. . . ."  The plaintiff cannot establish
that Pamrapo, through Brockman and Campbell, or those individuals independent of Pamrapo,
*controlled* the twelve-member hospital board which had ultimate oversight of the affairs of the
hospital.  *See, e.g., Konstantinakos v. Federal Deposit Ins. Corp.*, 719 F. Supp. 35, 41-42 (D.
Mass. 1989).  Indeed, 12 C.F.R. § 215.2(c)(2) discussing *presumption of control* (in categories
of (i) officership or directorship which must be coupled with a power to vote more than ten
percent "of any class of voting securities" of the purported controlled company, or (ii) otherwise
having such securities voting power), is inapposite to the nonprofit medical center here at issue.
Moreover, 12 C.F.R. § 215.2(c)(3), not dissimilar to the caution expressed in *U.S. Medical*
against expanding "insidership" merely by virtue of roles on multiple boards, provides as
follows:

> An individual is not considered to have control, including the power
> to exercise a controlling influence over the management or policies,
> of a company or bank solely by virtue of the individual's position as
> an officer or director of the company. . . .

*See, generally,* J.Virgil Mattingly, *Insider Lending Restrictions and Reporting Requirements Under
the Financial Institutions Regulatory and Interest Rate Control Act of 1978, As Amended*, 3 ANN.
REV. BANKING L. 21, 43 (1984).

[48]This court views Pamrapo's engaging in permitted areas of banking, a regulated
industry, as being in the ordinary course of its business.  Whether it never made a loan with
certain terms, or to an entity of a certain character, or otherwise lent funds in a manner that could
abstractly be viewed as "unique," should not, without a showing of such idiosyncracy as to put
the transaction beyond the pale, defeat a bank's (c)(2) defense.  The bank-hospital loan
transactions here do not fall outside the broad range of normalcy.  And, it is noteworthy that
even  "first time" transactions can be made in the ordinary course. *See, e.g., In re Ahaza Sys.,
Inc.,* 482 F.3d 1118, 1125-26 (9th Cir. 2007).

the loan approvals; the bank wanted to make the loan (out of civic duty as stated by bank

Chairman Massarelli), and the hospital, needing the line of credit, was fortunate to receive the

best of terms.[49]   The bank, as a responsible chartered member of the Bayonne commercial

community, did what was expected of it.   It met its civic duty.   Viewed in context, the

"particulars" of the Pamrapo loan do not disqualify the transaction(s) from being "ordinary" in

community terms.   *Cf. Matter of Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993),

describing § 547(c)(2) "ordinary business terms" as being a "range of terms that encompasses

the practices in which firms engage, and only dealings so idiosyncratic as to fall outside that

broad range should be deemed extraordinary" and thus outside the scope of the defense.   *Accord*,

*In re First Jersey Sec., Inc.*, 180 F.3d 504, 513 (3d Cir. 1999).

---

[49]The conflicts provisions of the BMC bylaws and the Lending Policy of the bank are roundly cited by the plaintiff as footings for the argument against the ordinariness of the loan transaction (and the repayment).  *See* Dkt. 31 at 29-34; Dkt. 35 at 17.  *See also* BMC ByLaws Art. VII at 7.01 (particularly ¶ 3) and Pamrapo Lending Policy at Parts 11 and 15.  Brockman Tr. I, Ex. 6; Panzer Certif., Ex. M; and Massarelli Tr., Exs. 3 and 4.  There is no contention, however, that the Brockman or Campbell vote on *either* board was decisive in any of the transaction approval processing.  The BMC board, comprised of twelve trustees, met on June 8, 2006 with twelve members present; on August 10, 2006 with eleven members present; and, on December 7, 2006 with twelve members present.  *See* Brockman Tr., Ex. 17 (BMC02201-02207) (redacted); Panzer Certif., Ex. T (BMC03881-03889); and, Hammonds Certif., Ex. F (PSB0046-0050), respectively.  This was a two-part multi-year loan transaction that both parties readily approved.  Therefore, even if the court (i) assumes the Brockman and Campbell votes were cast as claimed (a matter not totally clear on the record), and (ii) assumes that the organic provisions bar such votes (a matter clearer on the BMC side than the bank side), the infractions would be (as stated throughout this Opinion) *immaterial*.  And, it cannot be advanced with a straight face that any member of either board was unaware of the Brockman-Campbell dual memberships.

The beneficent nature of the 2005 Pamrapo loan was not reversed in May 2006.[50]  To the

contrary, the bank increased the line from $2 million to $3 million *and* eased payments (at the

same interest rate formula as previously used) to "interest only" (forsaking the element of

amortization previously required).  Such late-in-the-day easing of terms and increase in exposure

on an unsecured basis is the antithesis of creditor behavior often viewed as disqualifying

debt-creating transactions from being "ordinary."  *Contrast, e.g., In re Hechinger Inv. Co. of*

*Del., Inc.*, 489 F.3d 568, 576-79 (3d Cir. 2007).

> *Transfer Made in the Ordinary Course of Business of BMC and Pamrapo.*

The "subjective" test which would qualify the October 2006 transfer for the § 547(c)(2)

defense (given this court's finding in the bank's favor on the preamble prong as to the

ordinariness of the underlying debt), has been generally addressed in Part V (B), *supra*.  The

ordinary course of business of the debtor community hospital and the transferee community bank

was marked with the eased unsecured terms as described, beginning in February 2005 and

continuing through the October partial repayment.  The short extension of the loan and the

increase in May 2006 evidenced consistency in the BMC-Pamrapo business relationship.  The

understanding that bond financing would repay all (or even part) of the loan was mutual; the

May 12, 2006 loan revision predated by forty-nine days the original July 1, 2006 maturity date;

and in its May application for the loan increase BMC expressed the belief that by September

bond funding would be available.  When the HCFFA issue was delayed, Nuveen provided

bond-anticipation bridge financing.  As that loan closed, BMC only repaid in October an amount

_____

[50]The plaintiff concedes the obvious when, early in its briefing, the trustee characterizes
the Pamrapo loan as "eleemosynary." Dkt. 31 at 4.

equal to the May increase, did so approximately thirty days before the November 15, 2006 due

date, and did so in a proportion (ten percent of the face of the Nuveen notes) *less than* what was

to have been the proportionate payoff amount from the expected net bond proceeds (i.e.,

repayment of the $3 million loan from no more than $28 million of would-be net bond fund

proceeds).[51]  The October partial prepayment was consistent with loan documents and by no

means an unusual bank-borrower event.[52] *See Houston Heavy Equip. Co., Inc. v. Ed. Gould, et

al,* 198 B.R. 693 (S.D. Tex. 1996).[53]  And, though a $1 million payment is not insignificant, it

---

[51]Though the May 2006 loan extension and increase was premised on full repayment
from bond proceeds, and a full payment payoff letter was sent by the bank's Margaret Russo on
October 6, 2006, Campbell expressed the belief that after receiving the bond proceeds, BMC
could have remained a bank loan customer.  *See* Campbell Tr. 92:17-23.

[52]By December, as addressed in detail *supra*, the consistency in dealing and the nature of
the transaction (unsecured to secured) had changed; the mortgage transaction was a dramatic
departure from the earlier dealings and documentation, and was obviously made with bankruptcy
on the horizon.  It would not have qualified for the ordinary course defense, even if raised.  Nor
did the February and March monthly payments of interest and amortization to the extent of that
amortization; the May 2006 loan documents did not provide for any amortization.  This court's
Order of January 11, 2010 awarded summary judgment to the plaintiff for that portion of those
installments (per Counts II and III).

[53]
> The trustee argues that the company's payment and the bank's
> acceptance was [sic] outside the ordinary course of business because
> it was made one month before the loan's maturity date. When the debt
> must be paid back on demand, however, it is customary for a
> commercial business to pay the debt before demand even if it has not
> fully matured. The loan was paid voluntarily without insistence,
> collection threats, or legal enforcement. The trustee has no evidence
> that the bank took advantage of the company when its financial
> condition deteriorated. The debt was not paid on the eve of
> bankruptcy; rather, it was paid over six months before the company
> filed for bankruptcy. These data indicate that the loan was repaid in
> the ordinary course of business.

198 B.R. at 697.

was neither the hospital's last dollars, nor an aberrational amount given the size of the business

of BMC.[54]

Here, too, the plaintiff presses particulars (which have to an extent been addressed

previously herein).  Notably, it is argued (i) that the BMC board resolution of August 10, 2006

restricted the use of Nuveen funds, and (ii) BMC bylaws were offended by the repayment.

The August 10, 2006 BMC board resolution authorizing the borrowing to be funded by

the Nuveen notes provides as follows:

> BE IT RESOLVED, that the Board of Trustees approves and
> authorizes Administration to obtain up to $10,000,000 in bond
> anticipation financing, the proceeds of which will be used for
> reimbursement of prior capital expenditures and additional capital
> acquisitions.[55]

On its face, the *"reimbursement"* language of the resolution allows for use of funds as the

hospital would see fit (i.e., at least as part of working capital).   Evans and Brockman verify this

point (Evans Tr. 38:3-5; Brockman Tr. II 209:6-8).   Mohrle's testimony is *not* to the contrary

("*part of those monies*" would jump start capital projects to his recollection) (Mohrle Tr.

55:10-13).   A related question which arose in August 2006 was whether the *then existing* bond

issue restricted fund use.  On this question, BMC's counsel opined that the Nuveen funds would

have to be used for "working capital"; Authority counsel Mayer concurred, suggesting "that the

---

[54]*See* Part V(D), *infra*.  The plaintiff's expert's report, besides reflecting $2,160,348 cash
and cash equivalent balance as of October 31, 2006, tracks total BMC revenues from April 2006
through April 2007 in amounts which cumulatively approach $90 million.  Salaries and wages
alone generally exceeded $4 million a month ($4,641,000 in October 2006).

[55]The same resolution reflected the board's faith that the bond issue (originally thought to
be a September 2006 event) was "currently scheduled for October 2006" and that the temporary
Nuveen financing was to be paid off then.  Panzer Certif., Ex. T.

common accounting definition be used" for the term "working capital."[56] Indeed, in legal

accounting parlance working capital is "[c]urrent assets (such as cash, inventory, and accounts

receivable) less current liabilities," and it "measures liquidity and the ability to discharge

short-term obligations." BLACK'S LAW DICTIONARY (9th ed. 2009). "[S]hort term debt" is

"[c]ollectively, all debts and other liabilities that are payable within one year" (also termed

"current liability"). *Ibid*. To the same effect, *see Verizon Commc'n, Inc. v. F.C.C.,* 535 U.S.

467, 485 n.7 (2002). The Pamrapo loan debt was plainly a "short-term obligation" in October

2006, appropriate for discharge with working capital derived from Nuveen funding or otherwise.

The court thus finds the plaintiff's resolution-based argument on the purported restricted

use of Nuveen funds to be incorrect. Moreover, there is an inherent inconsistency in the

plaintiff's position: on the one hand it is argued (wrongly) that the board resolution hamstrung

the hospital in the use of Nuveen funds to meet the current liability to the bank, yet, on the other

hand the plaintiff asserts that the $1 million should have gone to satisfy other current liabilities

to trade creditors and the like–a use which would be no more "authorized" by the resolution

under the plaintiff's wrongheaded view of its text. Of course, the plaintiff ignores the fact that

by far the largest part of the Nuveen funds were available for nonbank related hospital

expenditures.

---

[56]It is noteworthy (i) that Mohrle's view that some of the Nuveen money could be used for capital projects is contrary to counsel's opinion; and (ii) BMC counsel's view was seen as "a reasonable interpretation" of the then existing bond indenture by the Authority's attorney. *See, inter alia,* Brockman Tr. II, Ex. 27, attached to Panzer Certif.

As to the bylaw point, the trustee again ignores plain meaning and the circumstances of the October 2006 payment to the bank.  The bylaw provision to which the plaintiff refers is as follows:

> No transaction involving benefit or payment of any kind to a Trustee or to an organization of which a Trustee is a member, officer, director or ten percent 10% stockholder shall be entered into by the Corporation without full disclosure by the interested Trustee and the approval of the Board of Trustees.  No Trustee so involved may have a vote in such approval or be counted as part of a quorum in which such a vote is made.

Brockman Tr. I, Ex. 6, attached to Panzer Certif.  For purposes of summary judgment on the bank's motion, it was (and is here) assumed that Brockman and Campbell should not have voted (to whatever extent they did) as BMC trustees in approving Pamrapo loans.  As pointed out earlier, given the admitted beneficial nature of the 2005 and 2006 loan transactions (and the concomitant total absence of any contention that the transactions would not have been approved without such votes), the bylaw offenses are immaterial to the loan transactions.  Such loose practices (though not technically ones involving votes by Brockman or Campbell) eventually proved costly to Pamrapo via this court's voiding of the mortgage transfer in December 2006.  *However, the loans were not so impugned.*

Nevertheless, the plaintiff citing the October partial prepayment, claims a bylaw infraction.  That is not the case, given that the restriction goes to the *transaction* which, on the face of the bylaw provision, is distinguished from "benefit or payment" derived from such a transaction.  *The loans were board approved by BMC and not materially impacted by the votes of the two trustees at issue*.  Once authorized, repayment per the terms of the approved transaction is not an event calling for yet another board approval.  Bylaws are thus not

implicated because the $1 million partial prepayment, for all of the reasons already stated, was

an expected, unexceptional, and ordinary business transfer–whether prompted by Brockman's

instructions[57] to Mohrle or a Campbell demand on behalf of the bank.[58]

The $1 million payment of October 2006 was made in the ordinary course of business of

the debtor, BMC, and the transferee, Pamrapo.  Given this finding, and the previous finding that

the loan transaction underlying this payment likewise developed in the ordinary course of the

business of each of these parties, the § 547(c)(2) defense to preference is established by the

defendant.[59]  The Code's purpose "to leave undisturbed normal financial relations,"

distinguishing preference policy "to discourage unusual action . . . during the debtor's slide into

bankruptcy," is satisfied by this conclusion.  H.R. REP. NO. 95-595 at 373 (1978), U.S. Cong. &

Admin. News 6329.  The New Jersey ordinary course defense of N.J.S.A. 25:2-30(f)(2), less

complex than the Code, is likewise established.

---

[57]This point is in dispute between Brockman and Mohrle; however, it is clear that management of BMC was in disarray, with Evans having resigned as CEO just before the Nuveen closing and Aaron, the CFO, having left somewhat earlier.

[58]At oral argument, the trustee's counsel took the position that even if not a prepayment, the BMC board would have to weigh-in on repayment when due; perhaps there would be some merit in this argument if, under exceptional circumstances, it were known at the time of such repayment that the hospital was using "last dollars" for that purpose.  However, on the heels of receiving $10 million (viewed as a "vote of confidence" by a sophisticated and presumably diligent lender like Nuveen), with a positive balance sheet and a continuing expectation that the HCFFA bond issue was still percolating (though delayed), such exceptional circumstances had not manifested.  (In addition, by the plaintiff's overreading of the bylaws, Brockman could not even give instructions to make payment of monthly interest installments.)

[59]There is no finding at this summary judgment stage as to § 547(c)(2)(B), the so-called "objective" standard.  Consistent with the purpose in expanding the scope of the § 547(c)(2) exception to discharge effected by the 2005 Code amendment, the findings set forth above qualify the defendant for this exception to preferences avoidance without the need to address the (c)(2)(B) prong of the defense.

65

D.    <u>Insolvency</u>.

The plaintiff has submitted an expert's report, an amendment to same, and a proffer in

support of the proposition that BMC was insolvent on the date of the $1 million transfer (i.e., on

the date the check was paid, October 17, 2006).[60] "Insolvency" is a necessary element per

§ 547(b)(3) to establish a voidable preference. *See* § 101(32), defining "insolvent" by a balance

sheet test at fair valuation of the debtor's property.

The original report reflected, at its Exhibit I, the BMC balance sheets for the months

ending April 2006 through April 2007. The data indicates a positive "net assets" position (i.e.,

solvency) until December 31, 2007 (there a negative $7,319,224). The previous three month-end

statements (all unaudited) indicate net assets of: $34,237,028 (September); $20,343,669

(October); and $18,224,565 (November). Cash and cash equivalents at the end of October was

$2,160,348. Harking back to previous discussion of insider status and ordinary course transfer,

at least per the internal hospital bookkeeping, solvency was not an issue when Nuveen infused

---

[60]Dkt. 6, Plaintiff's Motion for Summary Judgment, Certif. of Francis G. Conrad dated
December 10, 2008; Dkt. 44, Plaintiff's Motion for Reconsideration of January 11, 2010 Order
and Judgment, Certif. of Francis G. Conrad dated January 15, 2010; Dkt. 47, Plaintiff's
Response, Reply and Opposition (Plaintiff's Motion for Reconsideration), Certif. of Francis G.
Conrad dated February 19, 2010; Dkt. 59, Plaintiff's Proffer with Respect to Additional
Evidence, and Explanation as to Financial Expert's Use of FTI Cambio Financial Analysis dated
March 23, 2010. The report has eleven exhibits, including most notably for present purposes:
Ex. I ("Balance Sheet Data–For the Months Ending April 2006 through April 2007," the internal
hospital unaudited statements; later *adjusted* statements appear at Ex. VIII); and, Ex. II ("Income
Statement Data–From April 2006 through April 2007," the internal hospital unaudited
statements).

$10 million into the BMC account and the debtor made a partial repayment of its current liability to Pamrapo.[61]

The plaintiff's expert has submitted an adjusted set of balance sheets, reducing net assets as he sees appropriate.  *See* his Exhibit VIII.  Each of these adjusted balance sheets shows a positive net worth as of September 30, 2006, but negative territory for October 31 and beyond.[62]

Solvency matters are unclear on the record before this court at this time, and would require a trial to resolve the accounting adjustment issues raised by the trustee.  What is clear, however, is that solvency was a premise (assumed on the basis of hospital bookkeeping) when Pamrapo increased and extended its loan in May 2006, when Nuveen closed its $10 million loan on October 11, 2006, and when BMC tendered its $1 million check to the bank two days later.[63]

## VI.    **CONCLUSION**

The local Bayonne bank served to support the community's nonprofit hospital.   The bank's CEO was a hospital trustee and its treasurer.  The hospital board of trustees' Chairman and other trustees had affiliations with the bank (the Chairman becoming a bank board director in 2005).  By all accounts the bank was civic-minded and generous in providing the hospital with

---

[61]The financial circumstances at the time of the December 2006 mortgage transfer were thus significantly different both on the face of these internal records *and* in terms of the hoped-for $80 million bond issue–the latter being "in the works" in October but having evaporated by the December 7, 2006 BMC board meeting.

[62]Now the plaintiff would, by counsel's proffer, have the expert readjust the balances further downward.

[63]The New Jersey UFTA version retains the requirement for insider preference that the transferee "had reasonable cause to believe that the debtor was insolvent" at the time of the transfer.  N.J.S.A. 25:2-27(b).  Given the ostensible vote of confidence provided by the Nuveen closing, solvency as reflected in the BMC books and records at the time, and that the plaintiff has not offered any evidence of this belief element of the law, the defendant is entitled to summary judgment on Count IV.

an unsecured line of credit, first at $2 million, then extended in term and raised to $3 million.

Underlying the increased bank exposure was the assumption that an $80 million bond issue,

already being developed, would provide a long-term solution to hospital financial stresses and

would make funds available to pay off the bank loan.

   When the bond issue was delayed, and $10 million of bond anticipation note proceeds

were delivered to the hospital in October 2006, $1 million was paid to the bank in reduction of

its loan.  It was not until *after* October 2006 that the financial condition of BMC was perceived

to have come apart at the seams.  Huge losses were later booked for October 2006, and the

heavily relied upon bond issue evaporated.

   BMC *defaulted* on its remaining $2 million obligation to Pamrapo in November 2006,

leaving Pamrapo scrambling to secure its exposed unsecured line of credit loan.  The character of

the BMC-Pamrapo relationship then changed.  Pamrapo CEO Campbell, BMC Chairman

Brockman and others on the hospital board having connections to Pamrapo exerted undue

influence on BMC in December 2006.  A transaction developed in December–with hospital

bankruptcy on the horizon–which very much differed from the earlier unsecured line of credit

dealings.  Considering that certain critical December BMC board meeting and the resulting

mortgage collateral conveyed to the bank, this court had previously ruled that the Pamrapo

relationship with BMC *in December 2006,* was one of nonstatutory insider for preference

avoidance purposes.  The mortgage transfer was thus voided by Order of January 11, 2010.

   Harking back to October 2006, the circumstances affecting the relationship between

Pamrapo and BMC were at that time distinctly different from the later period.  The loan

transactions of 2005 and 2006, as well as the partial repayment in October, were the

unexceptional business of both community entities.  There is no reason to expand insidership to

the time of the October partial loan repayment.  Ordinary business of the bank and hospital, and

the context of charitable acts of the bank and community service of its directors, run counter to

concluding that Pamrapo was a nonstatutory insider of BMC at that time.  Affinity of the bank

and hospital through crossover directorships and other community contacts and events, and a

*later* non-arm's length transaction, do not, in these circumstances, render the bank an insider of

the hospital in October 2006.  Moreover, even if the bank were deemed to be an insider when

part of the loan was repaid, that payment, being in the ordinary course, would not be subject to

avoidance as a preference.

For the reasons set forth throughout this Opinion, the court will enter its implementing

Order to the following effect:

(i)     Pamrapo was not an "insider" when BMC repaid $1 million in October 2006 (thus

        awarding Pamrapo summary judgment as to: the plaintiff's Count I preference

        avoidance cause of action (based upon the plaintiff's failure to establish the

        necessary 11 U.S.C. § 547(b)(4)(B) timing element); and, the plaintiff's similar

        Count IV cause of action under N.J.S.A. 25:2-27(b) (for a like reason);

(ii)    Even if Pamrapo were deemed to be an insider of BMC, this court in determining

        that the $1 million October 2006 loan repayment was made in the ordinary course

        of the business of the parties per 11 U.S.C. § 547(c)(2) and N.J.S.A.

        25:2-30(f)(2), would award summary judgment to Pamrapo on Counts I and IV;

(iii)   Even if Pamrapo were an insider of BMC and the $1 million repayment was not

        an ordinary business transfer, Pamrapo, having no reason to believe BMC to be

69

insolvent at the time of the transfer, would be entitled to summary judgment on

Count IV (given the "belief" requirement of N.J.S.A. 25:2-27(b)); and

(iv)    The trustee's motion is denied.

This court awards the defendant summary judgment based upon facts which are either not in dispute or, where there is a dispute, viewing the disputed facts most favorably to the plaintiff. There is thus no triable issue of fact, and judgment is rendered as a matter of law.


Dated:  May 26, 2010                                        _____/s/ *Morris Stern*_____
                                                            MORRIS STERN
                                                            United States Bankruptcy Judge